Cheshire,
No. 4643.

RECONSTRUCTION FINANCE CORPORATION

*v.*

JOHN C. FAULKNER, JR. & a.

Argued May 6, 1958.
Decided July 1, 1958.

*Howard B. Lane, McLane, Carleton, Graf, Greene & Brown* and *Edward G. Griffin* (of Massachusetts) (*Mr. Graf* orally), for the plaintiff.

*Faulkner, Plaut & Hanna* and *John R. Goodnow* (*Mr. Hanna* orally), for the defendants.

LAMPRON, J. On October 26, 1951, the company executed two notes, each in the amount of $150,000, payable to the plaintiff according to certain terms therein specified. As security therefor the company executed a mortgage of its real estate, a chattel mortgage of machinery, equipment and other personal property located thereon, a factor's lien agreement covering work in process and other inventory items and an assignment of insurance policies insuring the life of its officers. As additional security each of the two principal stockholder-officers of the company and their wives signed identical guaranty agreements, except for a limitation of liability based on their respective stock holdings.

The notes having become in default the RFC foreclosed its real estate and chattel mortgages by sales held on August 11, 1954. The proceeds, $75,000 from the real estate and $133,915.12 from the personal property, were credited to the company's notes leaving a balance due of $65,410.71 sought to be recovered in these actions from the four guarantors.

The defendants admitted the execution and validity of the notes, the execution of the agreements of guaranty and the fact that all amounts of cash actually received by RFC have been credited on the company's notes. They denied however plaintiff's allegation that the company had received "all credits which it is entitled to" and claimed instead that credits in a larger amount should have been made on these notes. Defendants maintain that the company was entitled to be credited with the fair value of its real estate and chattels at the time RFC foreclosed its mortgages thereon. This value they claim was sufficient to pay the company's indebtedness in full. They allege that the reason why the fair value was not realized on foreclosure was due to careless and negligent action or failure to act as well as to willful acts and failures to act by the plaintiff in relation thereto.

In other words defendants take the position that although by their agreements they guaranteed "the due and punctual payment when due . . . of the principal of and interest on and all other sums payable" on these notes, there is nothing in their guaranty agreements which in any way released or waived their rights to the same credits on these notes as those to which the company is entitled. They maintain that if the company were credited with the amounts the property probably would have brought on foreclosure, if plaintiff had exercised due diligence and good faith, the company would owe RFC nothing and consequently neither would they.

The plaintiff's position is that the defendants by their agreements have expressly waived the defense based on the alleged negligent conduct of RFC which they now seek to assert. Also that defendants have failed to sustain the burden of proving their allegations of willful acts or failures to act by the plaintiff in the foreclosure of these mortgages. Further that "adopting, *arguendo* the guarantors' theory that they should be allowed to set off the difference between the amount actually received and the amount which would have been received had the sale been conducted differently . . . [they] never proved that more would have been received at a different type of sale." Hence plaintiff maintains the Court was justified in directing verdicts for it.

By ruling of the Trial Court on motion of the plaintiff made before trial defendants were precluded from introducing evidence specifically in proof of their allegation that plaintiff was guilty of negligence in its actions or failures to act in the foreclosure of the mortgages in question. However defendants' counsel stated at the trial "that our offer of proof on the negligence theory would be that which we are going to offer under the wilful theory anyway."

Defendants maintain that the evidence introduced, taken most favorably to them, proved substantially the following: RFC caused the real estate to be sold as a whole as well as the machinery and equipment although it was generally known and it knew that piecemeal sale, at least of the machinery and equipment would bring a larger price. Plaintiff did not employ a professional auctioneer to conduct the sales but relied instead on its local attorney in spite of the fact that it knew that a public auctioneer would get a better price. Even though it knew that advertising in newspapers and by mail would aid in securing a better price, RFC deliberately confined its conduct of the sales in question to the bare minimum requirements of the statute and intentionally conducted a sale in form only, merely for the purpose of obtaining legal title to the collateral, rather than one aimed at securing a reasonable price for it. Lastly that in spite of certain appraisals and recommendations to guide it as to what the amount of its top bids at the sales should be it deliberately set the amount of its high bid for the machinery and equipment at a lower figure than that recommended by its agent in the field.

The guaranty agreement executed by each defendant contained the following provisions. "The undersigned hereby grants to . . . [RFC] full power, in its uncontrolled discretion and without notice

to the undersigned, but subject to the provisions of any agreement between the Debtor or any other party and[RFC] at the time in force, to deal in any manner with . . . the collateral, including, but without limiting the generality of the foregoing, the following powers:

. . . e) In the event of the nonpayment when due . . . of any of the Liabilities . . . to realize on the collateral or any part thereof, as a whole or in such parcels or subdivided interest as [RFC] may elect, at any public or private sale or sales . . . without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the undersigned hereby waiving any such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise, or to forbear from realizing thereon, all as [RFC] in its uncontrolled discretion may deem proper, and to purchase all or any part of the collateral for its own account at any such sale or foreclosure, such powers to be exercised only to the extent permitted by law.

"The obligations of the undersigned hereunder shall not be released, discharged or in any way affected, nor shall the undersigned have any rights or recourse against [RFC] by reason of any action the Corporation may take or omit to take under the foregoing powers."

The extent of a guarantor's liability depends upon the terms of his contract. *Lavigne* v. *Lavigne*, 87 N. H. 223, 225. His obligation is that which the fair import of the language imposes upon him. *Brown Durrell Co.* v. *Belisle*, 83 N. H. 516. The construction to be placed on the agreement presents the question of what the parties meant by the words they employed. *Newcomb* v. *Ray*, 99 N. H. 463, 465.

We are of the opinion that the fair import (*Simons* v. *Steele*, 36 N. H. 73, 80; *Brown Durrell Co.* v. *Belisle, supra*) of the language used is that the parties intended that the powers and waivers enumerated in the agreement were to bind the parties unless the law prevented or unless other documents, such as the notes and mortgages, were inconsistent therewith. The notes executed by the company contained provisions similar to those found in the guaranty agreements. Certain of these in effect incorporated in the notes the "covenants and conditions" contained in the guaranties. The notes further provided that the maker empowered the plaintiff to sell "the whole or any part of the Collateral, at public or private sale, without . . . notice . . . . "

The plaintiff elected to "realize on the collateral . . . by foreclosure," a power specifically granted by paragraph (e) of the guaranties, and to follow the requirements of the mortgages and statutes in so doing. The real estate mortgage provided that "Upon any default . . . the mortgagee may sell the said property . . . either as a whole or in parcels . . . at public auction . . . without notice or demand, except first publishing a notice of the time and place of sale once a week for three successive weeks in some one newspaper published in the County of Cheshire and by sending, by registered mail, addressed to the mortgagor . . . a copy of said printed notice, the said notice to the mortgagor and the first publication of said notice to be at least twenty-one days before the date of sale." The chattel mortgage provided that "upon any default . . . the Mortgagee . . . may, subject to any provisions of law governing the foreclosure of chattel mortgages, sell any or all of said personal property at public auction, first giving five days' notice in writing of the time and place of sale to the Mortgagor . . . or by publishing such notice once a week for three successive weeks in some one newspaper published in or having a general circulation in said Keene." Both mortgages provided that the mortgagee "may purchase at any sale made as aforesaid."

The statutory requirements pertaining to the foreclosure of real estate mortgages under power of sale (RSA 479:25) and of chattel mortgages (RSA 360:28) were complied with by the plaintiff as were the conditions set out in the mortgages. "So far as the power itself defines the details of notice and execution in addition to, or not inconsistent with, statutory requirements, and provides for a sale in compliance with them, such provisions constitute an agreement of liquidated reasonableness, and their observance leaves open no inquiry as to their sufficiency, since the mortgagor has bound himself to a sale so advertised and so conducted." *Wheeler* v. *Slocinski*, 82 N. H. 211, 212. However, "so far as details are left to the mortgagee's judgment and discretion, they must be administered in the exercise of good faith and due diligence to protect the mortgagor's interests." *Id.*, 213.

The law is well settled that "the mortgagee in the exercise of the power of sale acts as a trustee of the mortgagor" (*Dugan* v. *Association*, 92 N. H. 44, 47), and the duty to exercise good faith and reasonable diligence arises out of this relationship. *Ib.*

The agreements of guaranty in these cases purported to grant in general terms "full power" and "uncontrolled discretion" to "deal

in any manner" with the collateral. Specific powers enumerated in five separate paragraphs, including paragraph (e) quoted above, were agreed to be included in the general power "without limiting [its] generality." One of the specific powers was the power to "realize on the collateral or any part thereof, as a whole or in such parcels or subdivided interests as [RFC] may elect . . . by foreclosure . . . . " The guaranties finally provided with respect to both general and special powers, that the guarantors should not be released from their obligations or "have any rights" against RFC by reason of "any action" it might take, or fail to take, under the powers granted to it.

Clearly the agreements were intended to operate to exculpate the plaintiff from any liability to the defendants arising out of liquidation of the security to the extent that the law would permit.

The law is settled that exculpatory agreements by a mortgagor which relieve a trustee from liability for negligence are valid and enforceable; but such provisions which purport to relieve from bad faith or intentional wrongs are considered to be against public policy and will not be enforced. II Scott on Trusts, s. 222.3; VI Williston, Contracts (Rev. ed.) s. 1751 B; Restatement, Contracts, ss. 573-575. See also, Payne, Cestuis' Agreements Exculpating Trustee, 19 Cornell L. Q. 171, 175; note, 37 Col. L. Rev. 248, 264.

In our opinion the Trial Court correctly ruled that the defense based upon the plaintiff's negligent action or failure to act in advertising, postponing or conducting the foreclosure sales was not open to them because of their agreements. *Simons* v. *Steele, supra; Brown Durrell Co.* v. *Belisle, supra.*

The defense presented at the trial was that because of willful action and refusal to act on the part of the plaintiff, the defendants have not been credited with an amount representing the fair value of the property sold at the foreclosure sale. As a part of this defense the defendants have alleged that the plaintiff "by its willful acts and its willful failure to act . . . so managed and disposed of said collateral as to cause it to deteriorate in value, to be wasted and lost."

The guaranty agreement provided that the obligations of the guarantor and the rights of the RFC in the collateral, "shall not be released, discharged or in any way affected, nor shall the undersigned have any rights against [RFC] . . . by reason of any deterioration, waste, or loss by fire, theft, or otherwise of any of the collateral unless such deterioration, waste, or loss be caused

by the willful act or willful failure to act of [RFC]." We agree with plaintiff's contention that this clause must be interpreted to mean damage to the collateral itself and cannot be interpreted to cover the receipt of a lesser amount than fair value at a public sale on foreclosure. See *Hanley* v. *Wadleigh*, 88 N. H. 174; 2 Tiffany, Real Property (3rd *ed.*) *s.* 630, *p.* 629. The words "deterioration," "loss by fire, theft" denote physical damage to the security and the use of the word "waste" therewith manifests an intention that it refer to the same type of damage. *Nashua &c. Paper Co.* v. *Noyes Co.*, 93 N. H. 348, 351.

The defense presented at the trial was in substance a charge by the defendants of bad faith on the part of the plaintiff in the exercise of the powers conferred by the guaranty agreements. We find it unnecessary to determine whether the law would permit the agreements in this case to be enforced so as to exculpate the plaintiff from liability for failure to act in good faith, because the defendants failed to produce evidence upon which the jury could find that the plaintiff acted in bad faith.

Proof of bad faith is not established by showing lack of due diligence. *Wheeler* v. *Slocinski*, 82 N. H. 211, 214, 215. "Consciousness of acting wrongfully must appear, and if the evidence is as consistent to show good as bad faith, the burden of proof is not met." *Id.*, 215. Thus it was incumbent upon the defendants to produce evidence from which it could reasonably be found more probable than not that the plaintiff so acted; and that as a result the amount received was less than fair and reasonable value.

Defendants' position is summarized in their brief as follows: "In spite of its knowledge that a piecemeal sale of machinery and equipment at auction would bring a higher price than sale as a lump and that it could have conducted such a sale by foreclosure; in spite of the fact that it knew that a professional auctioneer would get a better price than an amateur; and in spite of the fact that it knew that advertising in newspapers and by mail would aid in securing a better price, RFC deliberately confined its conduct of the sales in question to the base minimum requirements of the statute and intentionally conducted a sale in form only, merely for the purpose of obtaining legal title to the collateral, rather than one aimed at securing a reasonable price for the collateral. Even if RFC cannot be held responsible for these derelictions in its duty as a trustee of the collateral . . . its bidding at the foreclosure sale of the machinery and equipment was clearly intended to produce less than a reasonable price for the collateral."

In the first place, the position thus taken is not supported by the evidence. The evidence disclosed that the plaintiff in addition to complying with statutory requirements with respect to notice of the foreclosure sales advertised the sales in newspapers published in both Boston and New York, and that the sales received additional publicity not only through the local newspaper, but also in trade journals such as the Commonweal, The World Reporter, and the Daily News, which was calculated to reach members of the trade who might be prospective bidders.

Faulkner & Colony Mfg. Company, whose obligations were guaranteed by the defendants, was in receivership, and authority to foreclose the mortgages was first obtained by the plaintiff by court decree. The plaintiff's representative in this area, the witness O'Shea, who was "chief of the loan liquidation division," was familiar with the course of the receivership and with the unsuccessful attempts of the receiver to dispose of the mortgaged property as a going concern. The foreclosure sale was originally scheduled to be held upon June 30, 1954, but was twice postponed, once in order to permit consideration of an offer for the mortgaged property, and the second time, on instructions from the Washington office of RFC, in order to further provide advertising in a metropolitan paper.

Since the plaintiff in the exercise of its power of sale, might be called upon to bid at the sales in order to assure a fair price (*Wheeler* v. *Slocinski, supra*) consideration was given to fixing an upset price which the plaintiff should bid rather than permit the mortgaged property to be sold for less. In arriving at such a figure it had available appraisals of the properties showing their declining values over the period preceding the foreclosure. An appraisal by an RFC appraiser under date of January 1954, tended to establish a value of $201,880 for the machinery and equipment, if allowance were made for services of a professional auctioneer and extensive advertising consistent with what the defendants contended should have been provided. Another appraisal by an independent concern, the Freeman Company, indicated a probable net value for machinery and equipment of $157,000.

The witness O'Shea ultimately recommended that an upset bid price of $150,000 be fixed. This recommendation was not adopted, but he was instructed by the Washington office to use a figure of $125,000 for the machinery and equipment.

The property both real and personal was first offered as a unit,

with no bids resulting. The real estate was then sold, the mortgagee purchasing it for $75,000. Upon sale of the machinery and equipment, the final bid made by O'Shea for the RFC exceeded his authority, being for $128,000. O'Shea testified that he was prompted to take this action because out of the four bidders present, two had stopped bidding when $117,000 was reached, and the witness expected that they would increase their bids after he himself bid $125,000. This they failed to do, and the machinery and equipment was finally sold to a third bidder, Krock, for $128,500.

The record as a whole fails to disclose evidence upon which a jury could reasonably find that in the conduct of the foreclosure sales the plaintiff acted in bad faith or with willful or conscious intent to wrong the defendants. See *Browning* v. *Fidelity Trust Co.*, 250 Fed. 321, 325 (3rd Cir. 1918). Furthermore there was no evidence from which it could be found that the amount received from foreclosure was not the fair and reasonable price with which the mortgagor was entitled to be credited. The possibility that a higher price might have been obtained for the property under different circumstances, or at an owner's sale, was not competent evidence to prove that the amount received by the plaintiff was not fair and reasonable.

Since evidence of a plainly inadequate price might be thought to show bad faith (*cf. Griswold* v. *Morse*, 59 N. H. 211) it is necessary to consider the nature of the plaintiff's duty with respect to value. "He must use reasonable efforts to obtain a fair price for the property . . . in those particulars which the contract leaves to his determination." *Person* v. *Gooch*, 69 N. H. 208, 209. See also, *Wheeler* v. *Slocinski*, 82 N. H. 211; *Dugan* v. *Association*, 92 N. H. 44, 47. As the rule is understood, a fair and reasonable price under the circumstances in which the mortgagee acts is what is required. See note 103 Am. State Rep. 51. The test is not "fair market value" as in eminent domain cases (*cf. Davis* v. *State*, 94 N. H. 321) nor is the mortgagee bound to give credit for the highest possible amount which might be obtained under different circumstances, as at an owner's sale.

The witness Krock, who was the successful bidder at the sale and himself an auctioneer, testified that he could not say that "if the property had been liquidated item by item . . . a better price would [probably] have been obtained for the whole," although in fact he himself had resold the mortgaged property by

private sales and by auction, for a total price exceeding what he paid. The plaintiff's representative O'Shea testified that in his opinion the type of sale conducted by the plaintiff was designed to obtain the maximum amount. In reaching this conclusion he considered the fact that a piecemeal sale lends itself to control by bidders, and could result in a lower total price than a sale as a whole would produce when the mortgagee by its bidding keeps control.

The principal evidence offered by the defendants in support of their claim that a better price could have been obtained by piecemeal sale was the testimony of the witness O'Shaughnessy, a representative of the Freeman Company. He testified that a "sale as an entirety is always considered as a possibility but . . . almost invariably the piecemeal sale has exceeded the . . . entirety offer." The opinion of this witness was at variance with the opinions offered by the witnesses Krock and O'Shea, and the plaintiff's evidence shows that the possibility of piecemeal sale was not overlooked. Hence this testimony could not warrant a finding of bad faith on the part of the plaintiff, nor was it implemented by any evidence by which a jury could determine how much more a piecemeal sale would have produced than the amount actually received.

In this connection the defendants offered to prove the amount received by the witness Krock upon his resale of the machinery and equipment which he purchased. This evidence was properly excluded. The greater part in value thus resold by Krock was disposed of by private sales over a period of one hundred twenty days allowed for removal of machinery from the premises. The balance remaining was sold at public auction to some sixty or seventy purchasers of individual items. Evidence of the total amount received under these circumstances was not competent to prove that the amount received at the sales conducted by the plaintiff was not a fair and reasonable price on foreclosure. Furthermore the evidence was properly excluded in the Court's discretion as involving a disproportionate confusion of issues. *Eames* v. *Corporation*, 85 N. H. 379, 382. See *Tucker* v. *Hampton*, 96 N. H. 28. Questions to Krock and to an employee of the Freeman Company pertaining to a so-called Freeman appraisal were also properly excluded for the latter reason.

Viewing the evidence most favorably to the defendants, it could not reasonably be found that the plaintiff acted in bad faith by conducting the foreclosure sales in a manner which it knew would

produce less than the fair and reasonable value of the collateral; or that the amount received at the sales was in fact less than such value; or if it was less, how much the defendants were probably damaged thereby. We are therefore of the opinion that the Trial Court did not err in directing verdicts for the plaintiff.

*Exceptions overruled.*

WHEELER, J., did not sit; the others concurred.