UNITED STATES of America,
Plaintiff,

v.

Louis B. HOUFF, Jr., and C. E. Keefer,
Defendants and Third-Party Plaintiffs,

v.

The C. F. SAUER COMPANY, Third-
Party Defendant.

Civ. A. No. 527.

United States District Court
W. D. Virginia,
Lynchburg Division.

Feb. 7, 1962.

472

Thomas B. Mason, U. S. Atty., Roanoke, Va., for plaintiff.

John L. Abbot, and William L. Wilson, Lynchburg, Va., for defendants.

R. E. Cabell, Jr., Moncure & Cabell, Richmond, Va., for third-party defendant The C. F. Sauer Co.

MICHIE, District Judge.

This suit was instituted by the United States of America to recover from the original defendants, Louis B. Houff, Jr. and C. E. Keefer, now defendants and third-party plaintiffs but hereinafter sometimes called the Guarantors, a balance due on a loan made by the Small Business Administration, hereinafter called S. B. A., to Famous Virginia Foods Corporation, hereinafter called Famous Foods, now bankrupt, and guaranteed by the Guarantors.

The Guarantors were granted leave to make the C. F. Sauer Company, a Virginia corporation, hereinafter called Sauer, a third-party defendant and did so alleging that Sauer had purchased certain stock of Famous Foods and upon its purchase had agreed with the Guarantors to release them or have them released from any liability on the guaranty.

The Guarantors filed an answer in which eleven separate defenses were set forth. Sauer answered the third-party complaint and counterclaimed against the Guarantors for $500,000.00.

Elaborate interrogatories were filed by all parties and answers thereto were filed, including copies of numerous documents, as well as various motions, including motions for summary judgment with supporting affidavits.

The Court heard various motions on October 9, 1961, including the plaintiff's motion for a summary judgment, but that motion was not granted at that time which was before most of the answers to interrogatories and various affidavits which were attached to the subsequent motions for summary judgment had been filed.

Subsequently the plaintiff renewed its motion for a summary judgment and the Guarantors made a motion for summary judgment on the issue between them and the plaintiff.

### I.

### The Controversy Between the Plaintiff and the Guarantors.

The Court heard argument on the cross-motions for summary judgment on

January 19, 1962 and has now decided to grant the motion of the plaintiff for summary judgment.

To give the reasons for this conclusion involves a consideration of all eleven of the Guarantors' defenses as related to the facts as disclosed by the uncontradicted affidavits, answers to interrogatories, etc. I will do so seriatim.

### First Defense.

This is one of the defenses most seriously pressed and is to the effect that it was contrary to law for the S. B. A. to accept the defendant's guaranty of the note of Famous Foods.

The Guarantors rely upon the Small Business Act, Title 15 U.S.C.A. § 631 et seq., and particularly the requirement found in 15 U.S.C.A. 636(a) (1) (7) that:

> "All loans made under this subsection shall be of such sound value or so secured as reasonably to assure repayment."

In their memorandum in support of their motion for summary judgment the Guarantors say:

> "The authority is limited to making two kinds of 'loans': The first, of 'such sound value or [the second] so secured as reasonably to assure repayment.' The language referred to forbids exacting a guaranty. It is not to be supposed that the Government was making this loan with a view to its being paid by other than the borrower. The object is to help the business, and it is contemplated that the business pay the loan and not third persons. If the payment of a loan is guaranteed, it is readily available from any leading institution provided the guarantor is sound, and guaranteeing the payment of a loan would not of itself make it a loan of 'sound value' nor 'so secured' as to assure its *repayment*. The debtor would make 'repayment'; that is, would 'pay back; refund; restore; return.' Black's Law Dictionary, p. 1531. The guarantor pays in discharge of his obligation, not in the sense of returning, restoring or paying back a sum of money received by him but is paying the debt of another."

To answer the last part of the argument first, it seems just a matter of plain English to say that, no matter who pays the money to the S. B. A., the S. B. A. has received "repayment" when this has been done. The main point to the argument seems to be however that "a guaranty" is not "security".

Lawyers get into the habit of using the word security in connection with mortgages, deeds of trust and collateral security of various kinds, and sometimes forget the true meaning of the word. In Ballentine's Law Dictionary (1949 Ed.) at p. 1179 "security" is thus defined:

> "That which makes the enforcement or promise more certain than the mere personal obligation of the debtor or promisor, whatever may be his possessions or financial standing. It may be a pledge of property, *or an additional personal obligation;* but it means more than the mere promise of the debtor with property liable to general execution." (Emphasis supplied.)

And in Black's Law Dictionary (4th Ed.) at p. 1522 the term is defined as follows:

> "Protection; assurance; indemnification. The term is usually applied to an *obligation,* pledge, mortgage, deposit, lien, etc., given by a debtor in order to make sure the payment or performance of his debt, by furnishing the creditor with a resource to be used in case of failure in the principal obligation. The name is also sometimes given to one who becomes surety or *guarantor* for another." (Emphasis supplied.)

And in Bouv. Law Dict. (8th Ed., 1914, Rawle's Third Revision) Vol. II at p. 3032 appears the following:

> "Security. That which renders a matter sure; an instrument which renders certain the performance of a contract. A person who becomes the

surety for another, or who engages himself for the performance of another's contract. See Brown v. White, 3 Blackf. (Ind.) 431. Collateral security is security given for the payment of a debt, or the performance of some other act."

In Reconstruction Finance Corp. v. McCormick, 7 Cir., 102 F.2d 305, the Reconstruction Finance Corporation sued to recover on bank stockholders' statutory liability under the then Illinois law from various stockholders of a defunct bank to which the R. F. C. had lent money. The argument was unsuccessfully made for the defense that the R. F. C. had no power to rely upon any such statutory liability under state law, the argument being that such liability was not "such security" as the R. F. C. was authorized to rely on.

The Court was not impressed, saying:

"A loan contemplates the ultimate return of the moneys lent. If not, the advance had better be called a gift. Common practice is to exact security to insure the repayment of loans. Authority to exact and take security is implied from the grant of authority to make a loan. If restrictions upon the power of the corporation to lend or take security for authorized loans are asserted, those limitations must expressly appear. They are not to be implied, for of necessity they are somewhat inconsistent with a grant of power to lend money.

"There are no limitations upon the power of plaintiff to make loans, save one—the loan shall not 'be inconsistent with this Act.'

"Express authority to take security instead of being a limitation upon its power to include all forms of security, implied the contrary. The Act provides that the plaintiff may make the loan upon such terms and conditions not inconsistent with this Act 'as it may determine.'

"The provision that 'all loans made under the foregoing provisions shall be fully and adequately *secured*' is stressed by defendants, it being insisted that Congress here intended to accomplish two things: (a) to avoid loss because of inadequately secured loans, and (b) to limit the lender to securities commonly termed collateral, such as notes, bonds, mortgage bonds, stocks, etc. It is their position that this section, with the word 'secured' so defined, is exclusive.

"We do not so construe this sentence. It was not intended, as we view it, to be a restrictive sentence or a limitation on the power of plaintiff to lend money or to secure its loan. It was an admonition to the officers of the plaintiff to avoid loss, by adequately securing its loans—an admonition which would have profited plaintiff much had it been followed in this instance."

The similar language in the S. B. A. Act must be given a similar construction. I therefore find no merit in the Guarantors first defense.

### Second Defense.

■ The second defense is "that the guaranty sued on was without consideration." Apparently this defense is based on the fact that the date on the instrument of guaranty looks as shown in the following copy thereof:

From this the Guarantors argue that the guaranty was not actually given until July 11th but was subsequently dated back to correspond to the closing date of the transaction. And they argue that if the money was advanced before the guaranty was received the guaranty was without consideration.

The legal premise upon which this argument is based may be questioned. If I promise a bank that I will guarantee

my friend's note and the bank proceeds to lend money on the faith of my promise before they get my signed guaranty they may have trouble holding me to my promise under the statute of frauds. (Va.Code, § 11–2(4)). But, after I carry out my promise by delivering the written guaranty it could hardly be contended that the guaranty was made without consideration. The consideration was the advance of money to my friend.

Be that as it may, the question is foreclosed in this case by the uncontradicted evidence of the President of the participating bank that the guaranty, as well as the original note of Famous Foods and the agreement between the bank and Famous Foods were all received by him before any disbursements were made to Famous Foods. It is obvious therefore that no monies were advanced to Famous Foods until the guaranty was received and what date it then bore or what date it was then subsequently changed to carry would be immaterial so far as consideration is concerned.

### Third Defense.

The third defense is as follows:

"That at the time this action was commenced, Small Business Administration held security for the note alleged to have been guaranteed by the defendants valued at 154 per centum of the amount due on the loan and had not resorted to said security."

The guaranty contains the following paragraph:

"In case the Debtor shall fail to pay all or any part of the Liabilities when due, whether by acceleration or otherwise, according to the terms of said note, the undersigned, immediately upon the written demand of Bank, will pay to Bank, the amount due and unpaid by the Debtor as aforesaid, in like manner as if such amount constituted the direct and primary obligation of the undersigned. Bank shall not be required, prior to any such demand on, or payment by, the undersigned, to make any demand upon or pursue or exhaust any of its rights or remedies against the Debtor or others with respect to the payment of any of the Liabilities, or to pursue or exhaust any of its rights or remedies with respect to any part of the collateral. The undersigned shall have no right of subrogation whatsoever with respect to the Liabilities or the collateral unless and until Bank shall have received full payment of all the Liabilities."

That quotation should be sufficient to dispose of this defense. But, in addition, the Guarantors in the guaranty unconditionally guaranteed "to Bank, its successors and assigns, the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, of the principal of and interest on and all other sums payable, or stated to be payable, with respect to the note of the Debtor, made by the Debtor to Bank dated July 6 1959 * *."

This was a guaranty of payment, not a guaranty of collection. With respect to such a guaranty it is said in 38 C.J.S. Guaranty § 61, pp. 1217–1218:

"Where the guaranty is absolute, as in the case of a guaranty of payment, the guarantor is bound immediately on the failure of the principal debtor to perform his contract without further legal proceedings being taken by anyone, although the guarantor requests such proceedings. In accordance with this rule if the guaranty fixes the time of payment, and payment is not made within the time prescribed, there is a breach of the guaranty and no steps need be taken against the principal to fix liability on the guarantor. So, also, where one guarantees payment of a note at maturity without imposing other conditions, or waives demand and protest or notice of nonpayment, it is not necessary in order to hold the guarantor to institute legal proceedings against the

maker. A guaranty of the faithful performance of a lease, including the payment of rent, is an absolute guaranty under which the lessor may proceed against the guarantor without first proceeding or exhausting his remedies against the lessee.

"In the case of an absolute guaranty, the guarantee may at his election proceed against either the guarantor or the principal obligor, and he is not required in proceeding on the guaranty to elect whether he will ultimately attempt to recover payment of the principal debtor."

There is no merit in the third defense.

### Fourth Defense.

■ The fourth defense is as follows:

"That Small Business Administration has not exercised due diligence in endeavoring to collect from the principal debtor the note alleged to have been guaranteed."

What has been said with respect to the third defense applies equally here.

Of course it should be noted in connection with these defenses that the plaintiff has in fact subsequently foreclosed on the collateral, resulting in the reduction of the amount now claimed to $54,551.87 plus interest.

### Fifth Defense.

■ The fifth defense is as follows:

"That Small Business Administration on, to-wit, January 23, 1961, without the consent of the defendants, changed the agreed rate at which the collateral was to be 'bought out,' the proceeds of which would reduce the unpaid balance on said note."

The agreement between Famous Foods and the participating bank pursuant to which the loan was made provided that certain inventories of finished pickles located in a public warehouse having a current market value of not less than 154 per cent of the amount of the debt from time to time outstanding should be held as collateral for the debt. It also provided that:

"Famous Foods may, with the written consent of the Bank, withdraw collateral from the warehouse upon the prior payment to the Bank of 65% of the current market value of the collateral which it intends to withdraw, except that the collateral may at no time be diminished to an aggregate value of less than 154% of the then outstanding amount of the debt."

On January 27 1961, shortly before the bankruptcy of Famous Foods, S. B. A. wrote to the president of the participating bank referring to the then existing default and expressing some doubts as to the actual value of the collateral and stated:

"In view of the foregoing and until further determination of the status and condition of this inventory, it seems appropriate that the quantities and the physical cases themselves remain frozen; and to this end we would recommend that the Lawrence Warehouse Company be notified in writing that the right of release and substitution above referred to has been temporarily suspended and that no further releases or substitutions are to be permitted until they are further notified. If you concur in our recommendation we would appreciate your sending us a copy of the letter directed to the Lawrence Warehouse Company accomplishing this."

Acting on the advice of S. B. A. the bank so advised Famous Foods. This is evidently what the fifth defense refers to. And, while apparently not shown in the affidavits or answers to interrogatories, I gathered from the argument that there had been a previous change which changed the original withdrawal payments from 65% of value to 75% of value.

At any rate it is a sufficient reply to this defense to call attention to the language of the withdrawal provision which

provides that withdrawals might be made from time to time "with the written consent of the Bank." There is nothing in the agreement to limit the right of the bank to refuse to consent. Yet that refusal is what is complained of in this defense. Since the bank was only doing what the agreement clearly gave it the right to do the defense is without merit.

### Sixth Defense.

█ This defense is to the effect that when Sauer purchased practically all of the stock in Famous Foods, including that owned by the Guarantors, Sauer "agreed to release the defendants from the guaranty and S. B. A. thereafter dealt exclusively with C. F. Sauer Company with respect to the business of Famous Virginia Foods Corporation and particularly the collateral securing the note guaranteed and thereby released the defendants from the guaranty."

Sauer obviously could not agree to release the Guarantors as it was not a party to the guaranty in any sense, much less a beneficiary thereof. And the fact that S. B. A. thereafter dealt with Sauer as the directing force in Famous Foods in no way released Famous Foods or the Guarantors from anything.

### Seventh and Eighth Defenses.

█ The seventh and eighth defenses are related and will be dealt with together.

The seventh is:

"That the maker of the note alleged to be guaranteed was placed in voluntary bankruptcy by The C. F. Sauer Company, the owner of most of its stock, by agreement with Small Business, thereby destroying a large part of the value of the collateral securing the note alleged to be guaranteed."

And the eighth defense is:

"That Small Business Administration in dealing with The C. F. Sauer Company with respect to the collateral, by its acts and wilful refusal to cooperate, forced The C. F. Sauer Company to place Famous Virginia Foods Corporation in bankruptcy, thereby destroying a large part of the value of the collateral securing the note alleged to be guaranteed."

When the holder of practically all of the stock in a corporation agrees that the corporation should be placed in bankruptcy it is not surprising that the holder of its notes came to the same conclusion.

It is probably true that the collateral, consisting of pickles produced by Famous Foods, was more valuable while Famous Foods was a going concern than it afterwards became. But this does not mean that the principal stockholder and/or the principal creditor were obligated to keep a losing concern in business indefinitely while its situation became worse and worse. There is no suggestion that the parties used other than reasonable judgment in the determination that the situation was hopeless. Both, and particularly Sauer, had everything to gain if the situation could be worked out.

Certainly in the absence of any allegations of improper motives these charges could constitute no defense.

### Ninth and Tenth Defenses.

██ These two defenses are related and will therefore be treated together. The ninth defense claims that S. B. A. sold the collateral securing the note negligently in various particulars and the tenth defense claims that it did so wilfully and therefore the collateral suffered serious deterioration, waste and loss. This tenth defense is an effort to take the case out of the purview of that provision in the guaranty which provides that "The obligations of the undersigned hereunder, and the rights of Bank in the collateral, shall not be released, discharged or in any way affected, nor shall the undersigned have any rights against Bank by reason of * * * any deterioration, waste, or loss by fire, theft, or otherwise of any of the collateral unless such deterioration, waste, or loss be caused by the wilful act or wilful failure to act of Bank."

Among the rights granted the participating Bank by the guaranty agreement was the following:

"(c) In the event of the nonpayment when due, whether by acceleration or otherwise, of any of the Liabilities, or in the event of default in the performance of any obligation comprised in the collateral, to realize on the collateral or any part thereof, as a whole or in such parcels or subdivided interests as Bank may elect, at any public or private sales, for cash or on credit or for future delivery, without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the undersigned hereby waiving any such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise, or to forbear from realizing thereon, all as Bank in its uncontrolled discretion may deem proper, and to purchase all or any part of the collateral for its own account at any such sale or foreclosure, such powers to be exercised only to the extent permitted by law."

The answer of the plaintiff to the Guarantors' interrogatory number 8 was as follows:

"*Answer to Interrogatory No. 8.* The original advertised terms of the auction sale of the collateral held on May 2, 1961 are as set forth in the attached copy of advertisement which appeared on Sunday, April 23, 1961 in the following newspapers:

"*The Boston Sunday Globe,* Boston, Massachusetts

"*The Charlotte Observer,* Charlotte, North Carolina

"*The Philadelphia Inquirier,* Philadelphia, Pennsylvania

"*The New York Times,* New York, New York

"In addition, the said advertisement was published in the *Daily Advance,* Lynchburg, Virginia on April 24, 1961. In addition, a sales announcement was mailed to a total of 4,176 wholesale grocers, chain stores, institutional buyers, food brokers and pickle processors in the following states: Delaware, District of Columbia, Georgia, Kentucky, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Virginia and West Virginia. No changes were made in the said advertised terms and therefore no advertisement of change was necessary, nor was any made."

There is no requirement in the guaranty for labeling the collateral which was unlabeled and whether or not it should have been done, in view of the expense involved, was a matter of judgment. And certainly, under the circumstances, the requirement of payment in cash at the time of sale is not unreasonable and the same would seem to apply to the other criticisms mentioned in the ninth defense.

A somewhat similar situation arose in Reconstruction Finance Corporation v. Faulkner, 101 N.H. 352, 143 A.2d 403. There the claim was made that the whole amount of debt could have been paid as a result of the sale but for failure to realize the fair value at the sale "due to careless and negligent action or failure to act as well as to willful acts and failures to act by the plaintiff in relation thereto." The criticisms were also that the sale was made as a whole instead of piecemeal; that no professional auctioneer was employed; and that there was no advertising in newspapers or by mail. The terms of the guaranty in that case permitted a sale upon default "as a whole or in such parcels or subdivided interests as [RFC] may elect, at any public or private sale or sales * * * without demand, advertisement or notice of the time or place of sale * * *."

The Court said:

"In our opinion the Trial Court correctly ruled that the defense based upon the plaintiff's negligent action or failure to act in advertising, postponing or conducting the foreclosure sales was not open to

them because of their agreements. * * *

"The defense presented at the trial was that because of willful action and refusal to act on the part of the plaintiff, the defendants have not been credited with an amount representing the fair value of the property sold at the foreclosure sale. As a part of this defense the defendants have alleged that the plaintiff 'by its willful acts and its willful failure to act * * * so managed and disposed of said collateral as to cause it to deteriorate in value, to be wasted and lost.'

"The guaranty agreement provided that the obligations of the guarantor and the rights of the RFC in the collateral, 'shall not be released, discharged or in any way affected, nor shall the undersigned have any rights against [RFC] * * * by reason of any deterioration, waste, or loss by fire, theft, or otherwise of any of the collateral unless such deterioration, waste, or loss be caused by the willful act or willful failure to act of [RFC].' We agree with plaintiff's contention that this clause must be interpreted to mean damage to the collateral itself and cannot be interpreted to cover the receipt of a lesser amount than fair value at a public sale or foreclosure. See Hanley v. Wadleigh, 88 N.H. 174, 186 A. 505; 2 Tiffany, Real Property, 3d Ed., § 630, p. 629. The words 'deterioration,' 'loss by fire, theft' denote physical damage to the security and the use of the word 'waste' therewith manifests an intention that it refer to the same type of damage. Nashua Gummed & Coated Paper Co. v. Noyes Buick Co., 93 N.H. 348, 351, 41 A.2d 920.

"The defense presented at the trial was in substance a charge by the defendants of bad faith on the part of the plaintiff in the exercise of the powers conferred by the guaranty agreements. We find it un-necessary to determine whether the law would permit the agreements in this case to be enforced so as to exculpate the plaintiff from liability for failure to act in good faith, because the defendants failed to produce evidence upon which the jury could find that the plaintiff acted in bad faith.

"Proof of bad faith is not established by showing lack of due diligence. * * *

"The record as a whole fails to disclose evidence upon which a jury could reasonably find that in the conduct of the foreclosure sales the plaintiff acted in bad faith or with willful or conscious intent to wrong the defendants."

On the first hearing on the motion for summary judgment I construed the allegation of wilfulness as meaning to imply a deliberate attempt that the sale should be so made that the property should bring less than its full value. And while I thought it was extremely improbable that the Guarantors could do so, I thought they should have an opportunity to prove this allegation. In the argument on the renewed motion for summary judgment, counsel for the Guarantors stated that my construction of what they meant by wilful was not what they meant in their pleading and stated that, on the contrary, they had used the word wilfully as meaning that the S. B. A. did what it did in the way of advertising the sale intentionally and therefore wilfully in that sense and that, whether they intended the result or not, the result was that the collateral did not bring its full value.

In other words there is no claim that the S. B. A. intentionally sold the goods so that they would not bring their full value but rather that it intended to sell as it did sell and that the result of such sale was that, irrespective of intent as to getting full value, the goods did not in fact bring their full value.

I believe, however, that the word wilfully as used in the act refers to an in-

tent to bring about the deterioration of the property. As said in Hazle v. Southern Pac. Co., 9 Cir., 173 F. 431.

"A 'willful' act is one that is done knowingly and purposely, with the direct object in view of injuring another."

And no such intent is now charged. And I also believe that the court in the Faulkner case cited above was correct in its conclusion that the clause relating to a "willful act or willful failure to act of [Bank]" refers to a physical "deterioration, waste, or loss by fire, theft, or otherwise" of the collateral and no such physical loss occurred here.

We come back therefore to the question of whether the sale was conducted in accordance with the terms of the guaranty and I think that it clearly was.

It follows therefore that neither the ninth or tenth defenses can constitute a valid defense.

### Eleventh Defense.

This defense is merely to the effect that the Guarantors should be credited with the amount actually realized on the collateral and this has now been done by the plaintiff so that this defense is no longer in issue.

### Conclusion as to Motions.

Since it is my opinion that all of the defenses have either been shown by the affidavits, etc. not to be factually well-founded or do not in any event constitute valid defenses, summary judgment must be entered for the plaintiff. And of course the Guarantors' motion for a summary judgment must be denied.

An order will be entered accordingly.

### II.

### The Third-Party Complaint.

■ Having disposed of the original complaint we have left the third-party complaint. This issue will obviously involve a conflict of evidence and no effort has been made to dispose of it by a motion for summary judgment.

However it does not follow that this court need proceed further with it. No federal issue is involved, the third-party plaintiffs are both residents of Virginia and the third-party defendant is a Virginia corporation, with its principal place of business in Richmond, Virginia. There is no reason therefore why this litigation should proceed in a federal court.

A similar situation existed in Duke v. Reconstruction Finance Corporation, 209 F.2d 204 (4th Cir. 1954). In that case the R. F. C. instituted an action in the District Court against officers of Bond Construction Corporation to recover on a contract of guaranty. The officers brought in third-party defendants. After a trial the court entered judgment against the guarantors and then, upon motion of one of the third-party defendants, vacated the previous order permitting the impleading of the third-party defendants on the ground that, the original case having been decided, there was no federal question presented by the third-party proceeding and all of the parties to it were residents of the state of Maryland.

This last action was taken on motion of one of the third-party defendants and in all of the cases referred to, upon which the decision in the Duke case was based, the action had been taken upon motion of one of the parties to the third-party proceeding. If either of the parties to the third-party proceeding in the case at bar makes a similar motion I shall grant it. If neither does I shall consider whether or not I can vacate the order without such a motion. The reasoning of the cases would seem to indicate that I could though, as indicated above, I have found no case in which such action was taken without a motion from one of the parties.