**Stephen E. KING, Debtor.**

**No. 02–37616(CGM).**

United States Bankruptcy Court,
S.D. New York,
Poughkeepsie Division.

Feb. 3, 2004.

Cynthia Rosenzweig, Van DeWater and Van DeWater, LLP, Poughkeepsie, NY, for Creditor Upper Valley Commercial Corporation.

Lewis D. Wrobel, Poughkeepsie, NY, for Debtor Stephen E. King.

Anthony Carlini, Poughkeepsie, NY, Special Counsel for Debtor Stephen E. King.

### *MEMORANDUM DECISION ON CREDITOR'S MOTION TO LIFT STAY AND DEBTOR'S OBJECTION TO CREDITOR'S PROOFS OF CLAIM*

CECELIA G. MORRIS, Bankruptcy Judge.

Creditor Upper Valley Commercial Corporation moved to Lift the Automatic Stay

pursuant to § 362(d)(1). Debtor filed opposition to the Motion to Lift the Automatic Stay and objected to Upper Valley Commercial Corporation's Proofs of Claim Numbers 7 and 8, filed December 11, 2002 and September 18, 2003 respectively. For the reasons set forth below, upon consideration of the testimony and evidence submitted at the evidentiary hearing held October 9, 2003, together with the papers and legal arguments submitted by both parties, the Court overrules Debtor's objection to Upper Valley Commercial Corporation's Claim Number 7, and grants Upper Valley Commercial Corporation relief from the automatic stay imposed by 11 U.S.C. § 362. With regard to Upper Valley Commercial Corporation's Claim Number 8, Upper Valley Commercial Corporation is granted leave to amend this claim to reflect the appropriate amount guaranteed by Debtor. The leave to amend Claim Number 8 is granted without prejudice to Debtor's right to object to the amended claim on any grounds not decided herein.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. Allowance or disallowance of claims against the bankruptcy estate and motions to terminate, annul, or modify the automatic stay are "core proceedings" under 28 U.S.C. § 157(c)(2)(B) and (G).

## FINDINGS AND CONCLUSIONS

Testimony was taken on this contested matter during an evidentiary hearing heard on October 9, 2003. The parties submitted pre-trial and post-trial briefs.

The following constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rules 9014 and 7052.

## BACKGROUND FACTS

Debtor Stephen E. King (the "Debtor") and Movant herein, Upper Valley Commercial Corporation ("UVCC"), had a longstanding business relationship that commenced in or around February, 1990, at which time Debtor and minority shareholder Geraldine Fulling approached UVCC for financial assistance. Debtor was the majority Shareholder in G & S Energy, d/b/a/ STK Petroleum Products, Inc. ("STK") with offices in Milan, New York. (*See* Debtor's 2/21/2003 Affidavit in Opposition to Upper Valley Commercial Corporation's Motion for Relief From Automatic Stay, at ¶ 26). Ms. Fuller held 49 shares and Debtor held 51 shares of the 100 outstanding shares of STK stock. In October, 2002, David Patten and Alvin Fadden, principals of UVCC, together owned 69% of the shares of STK. The manner by which David Patten and Alvin Fadden came by these shares is disputed, but apparently, Debtor and Ms. Fulling each transferred 20 shares of stock to David Patten and Alvin Fadden in 1999 in exchange for financial assistance. Subsequent to this transaction, Ms. Fulling, upon the break up of her personal relationship with Debtor, sold her remaining STK stock to Mr. Fadden and Mr. David Patten. From February, 1990 until October, 2002, UVCC was STK's only supplier of propane gas. *Id.* As the parties' business relationship progressed, UVCC lent money to STK for, *inter alia,* various construction projects, as well as to Debtor in his personal capacity.[1]

---

1. The Debtor executed and delivered to UVCC a series of unsecured personal notes during the period between November, 1998 to June, 1999 in the aggregate amount of $120,000.00 (the "Personal Notes"). See Joint Pretrial Or-

In connection with the parties' financial transactions, the Debtor, on behalf of STK, executed and delivered a series of promissory notes evidencing obligations owed to Upper Valley during the period January, 1991 to approximately March, 2002 (the "Corporate Notes"). *See* Joint Pretrial Order entered October 9, 2003, Docket # 87 (the "Joint Pretrial Order"). The Debtor and Ms. Fulling personally guaranteed many of the Corporate Notes. The Debtor also executed and delivered to Upper Valley a collateral security mortgage dated March 22, 1993, in the sum of $100,000.00 (the "Mortgage") secured by property located at 486 Milan Hill Road, Town of Milan, County of Dutchess, New York (the "Real Property"). *Id.* The parties have stipulated that the Real Property had a value as of November 1, 2002 of $275,000.00. *Id.*

UVCC alleges that the Corporation defaulted on its obligations under the Corporate Notes in October, 2002. Specifically, Mr. Edward Patten, chairman of the board of UVCC, testified that STK's default was in the nature of untimely payments. *See* Evidentiary Hearing Transcript of October 9, 2003 Hearing at p. 29. ("Tr.") STK's obligations to UVCC were accelerated on October 9, 2002 and STK was notified of the debt acceleration by way of correspondence (the "Acceleration Notice") prepared by UVCC's counsel. The Acceleration Notice was also delivered to Debtor personally by David Hagstrom, UVCC's attorney. The Acceleration Notice stated that the total principal amount due to UVCC was $2,339,384.16, that STK had defaulted under the terms of the Corporate Notes and the Corporate Security Agreements and STK had not cured the default within the required twenty-day period. UVCC demanded possession of the collateral described in the Corporate Security Agreements, to wit: all accounts receivables, inventory, fixtures, furniture, machinery, equipment and proceeds thereof, as well as the premises located at 917 Route 199 in Red Hook, New York ("STK's Assets"). UVCC stated in the Acceleration Notice that it was exercising its rights under the Collateral Assignment of Corporate Security Agreements dated March 22, 1993,[2] and transferred Debtor's remaining thirty-one shares of STK stock to UVCC. Thus as of October, 2002, David Patten and Alvin Fadden owned 69% of STK stock, and UVCC owned 31 shares of stock.

Debtor resigned his position as director, officer and employee of STK by way of a letter dated October 11, 2002 and addressed to Alvin Fadden, vice president and secretary of UVCC, and shareholder in STK. On November 1, 2002, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

### DISCUSSION

On January 22, 2003, UVCC filed a Motion for Relief from the Automatic Stay (the "Lift Stay Motion") pursuant to 11 U.S.C. § 362(d)(1) & (2)[3] seeking to fore-

---

der, ECF Docket # 87, entered October 9, 2003, at ¶ 4.

**2.** The Collateral Assignment, UVCC Trial Exhibit 34, states in pertinent part: "Upper Valley Commercial Corporation shall have the right at any time after default, at its option, to transfer or cause to be transferred to or registered in the name of Upper Valley Commercial Corporation, or its nominee or nominees, all said collateral securities..."

**3.** At the Evidentiary Hearing on this matter, counsel for UVCC withdrew the 11 U.S.C. § 362(d)(2) argument, and the Court only heard evidence as to whether cause existed to lift the stay pursuant to 11 U.S.C. § 362(d)(1). Evidentiary Hearing Transcript, p. 4. The Court has therefore omitted any reference to the parties' arguments in regard to the § 362(d)(2) claim.

close on UVCC's interest in the Premises. UVCC argued that "cause" existed to lift the automatic stay as UVCC was not adequately protected, in that Debtor had failed to make any payments on the Mortgage since UVCC accelerated STK debt, was thus using UVCC's collateral "rent free" and had further failed to provide UVCC with an additional or replacement lien.

Debtor opposed the Lift Stay Motion, alleging that Champion Mortgage Corporation had satisfied the Mortgage via a wire transfer in the amount of $97,075.74 made on January 30, 2001. Debtor further alleged that UVCC was in violation of New York State Real Property Law § 1921 for failing to file a satisfaction of Mortgage in connection with the alleged payoff of the Mortgage. The Debtor argued that he did in fact have equity in the Real Property, which was valued at $275,000. As the face value of the mortgage held by UVCC was $100,000, Debtor advanced that he had $175,000 in equity in the Real Property. Thus, UVCC was adequately protected by a large equity cushion. Additionally, Debtor contended that the default of STK Petroleum under the notes was a "sham," because UVCC had made no attempt to collect the secured debt from STK. In support of this contention, Debtor points out that as of October, 2002, the principals of STK (David Patten, Edward Patten and Alvin Fadden) were also the principals of UVCC. Finally, Debtor advanced that STK's Assets were worth more than four million dollars, and Debtor maintained that UVCC must "marshal" the assets of STK prior to seeking satisfaction of their security interest from the Debtor's home.

UVCC filed a reply to the Debtor's opposition to the Lift Stay Motion, stating that the $97,075.74 Champion had paid to UVCC, purportedly in satisfaction of UVCC's mortgage, was instead repayment of the various unsecured personal loans made to Mr. King in his personal capacity.[4] UVCC stated that it was owed over $2.5 million dollars from STK, that the mortgage was given to UVCC as security for the existing and future debts of the corporate entity, and that until the $2.5 million debt was satisfied, they were entitled to collect on the Mortgage.

UVCC filed two Proofs of Claim; a secured claim for $100,000.00 ("Claim No. 7") and an unsecured claim for $3,065,723.10 ("Claim No. 8"). Debtor objected to both proofs of claim.

On April 1, 2003, this Court scheduled an evidentiary hearing for May 22, 2003, to hear evidence regarding the disputed issues herein. The hearing was further adjourned to June 12, 2003. On June 9, 2003, a letter was forwarded to this Court by counsel for UVCC that set forth a discovery schedule, which adjourned the evidentiary hearing on consent of the parties until August 28, 2003. Although the letter directed to the Court was not signed by counsel for Debtor, neither party objected to the proposed schedule and both parties agreed to a longer scheduling order. Pursuant to the agreed upon schedule, the parties were to each conduct appraisals of STK's assets and exchange appraisal reports by July 14, 2003. All discovery, including motions in limine and depositions, was to be complete by August 11, 2003.

---

4. In fact, Debtor failed to provide UVCC's counsel with appropriate documentation in support of the Champion payoff argument in the discovery phase of this proceeding, and by stipulation of the parties, so ordered by this Court on September 11, 2003, Debtor agreed that he would not offer evidence in support of the payoff argument.

## I. THE MOTION IN LIMINE

Pursuant to the June 9, 2003 letter memorializing the agreement of the parties as to a discovery schedule, the deadline for obtaining the appraisals of STK's assets was July 14, 2003. The Debtor never obtained an appraisal, despite raising the valuation issue in defense of the motion to lift the stay and in objection to UVCC's Proof of Claim # 7. Instead of promptly informing UVCC of his decision not to obtain an appraisal, Debtor kept UVCC in suspense and failed to notify UVCC that Debtor would not obtain his own appraisals until August, 2003, subsequent to the agreed upon deadline and after UVCC had obtained its own professional valuation of STK's corporate assets.

Debtor also failed to comply with several of UVCC's discovery requests, and UVCC was obliged to make a motion in limine seeking to preclude Debtor from entering evidence and awarding attorney's fees. Specifically, UVCC sought to preclude introduction of any evidence with regard to twelve (12) unanswered deposition questions [5] to which Debtor had agreed, at the May 19, 2003 deposition, to provide responses at a later date. Debtor never supplemented his deposition testimony. UVCC also sought an order precluding evidence relating to a downward modification of a mortgage held by Thomas King, Debtor's brother. Additionally, UVCC sought to preclude Debtor from offering any evidence relating to an appraisal and/or valuation of STK and its corporate assets at the evidentiary hearing, or objecting to UVCC appraisals. UVCC also asked that the Court admit its appraisal reports without expert testimony from the appraisers who prepared them, decide the marshaling of assets issue in favor of UVCC or deem the marshaling issues irrelevant based upon UVCC appraisals (which UVCC indicated proved that STK was worth far less than the amount owed to UVCC); and decide the issue of fact as to the turnover of corporate assets to UVCC in its favor or deem the turnover irrelevant in light of the valuation of STK assets. UVCC also sought counsel fees in connection with bringing the motion in limine.

Debtor was ordered by this Court to provide the requested information within forty-eight hours of the August 19, 2003 hearing on UVCC's motion in limine. The parties stipulated that Debtor would not offer any valuation or appraisals of STK into evidence. UVCC was ordered to produce the appraisers who prepared the val-

---

**5.** Debtor was to provide the name of the house appraiser who appraised the Premises, the address of Sandra King, the amount due on the First Federal Mortgage, the amount due on the Home Loans Mortgage, the phone number for Champion Mortgage, the contact person at Champion Mortgage, the amount due on his Washington Mutual Loan Mortgage, a Citi Financial letter, the individual at Champion Mortgage who prepared the letter attached as Exhibit B to Debtor's Affidavit in Opposition to the Lift Stay Motion, the amount of personal money Stephen King invested in STK, and the amount of STK stock and Geraldine Fulling's stock used as collateral for the Corporate Notes. At the Evidentiary Hearing on this matter, special counsel to Debtor argued that UVCC counsel had been provided some of the information sought to UVCC *prior* to the deposition and thus Debtor was not obligated to provide the information, despite *agreeing* to do so at the deposition. This argument was presented for the first time to the Court at the Evidentiary Hearing, and not advanced in the Debtor's written oppositions to UVCC's motions. Debtor did not raise this defense at the hearing on the UVCC's Motion in Limine brought by Order to Show Cause on August 18, 2003. Rather, Debtor advanced on August 18, 2003 that the only evidence they would seek to submit was the amount of personal funds Debtor had invested in STK. There is also no evidence that Debtor informed UVCC's counsel that UVCC was in fact already in possession of the information sought.

uations of STK assets at the evidentiary hearing for cross-examination as to the appraisers' methodology only.[6] The Court further precluded Debtor, in reliance on the parties' stipulation on the record, from offering into evidence a letter from Champion Mortgage Corporation's counsel Zavatsky, Mendelsohn, Gross, Savino & Levy which purported to convey mortgage payoff funds to UVCC. The Court did not decide the legal issue regarding marshaling of assets or the factual issue of the turnover of corporate assets at the August 19, 2003 hearing on UVCC's motion in limine brought by Order to Show Cause, reserving decision on these issues until the parties had an opportunity to further brief their arguments.

A final pre-hearing conference and oral arguments on the open issues pending on UVCC's motion in limine were scheduled for September 30, 2003. Prior to the September 30, 2003 hearing, on September 11, 2003, this Court entered an Order precluding Debtor from introducing the information requested at his deposition, as Debtor failed to meet the Court's forty-eight hour deadline.[7]

In Debtor's response to UVCC's motion in limine, filed in accordance with a scheduling stipulation entered into between the parties and so-ordered by this Court on September 16, 2003, Debtor argued that monetary sanctions should not be awarded to UVCC in the form of attorneys' fees because no predicate order had been entered by this Court concerning a *requirement* to obtain appraisals or valuations. Debtor further argued that default judg-

ment on the issues of marshaling and corporate turnover were inappropriate without the entry of an appropriate Order compelling discovery. UVCC responded that well settled legal authority permitted an award of attorney's fees for failure to provide discovery, citing *Scherling v. Pan Trading Corp. (In re Chadborne Indus., Ltd.),* 71 B.R. 86 (Bankr.S.D.N.Y.1987). This Court ruled on UVCC's Motion in Limine on October 3, 2003, and the Court's reasoning for its ruling is provided below.

## A. *Execution of Debtor's Deposition Transcript and The Unanswered Deposition Questions*

■ In its October 3, 2003 ruling the Court noted that Federal Rule of Civil Procedure 30(e), made applicable to bankruptcy proceedings through Federal Rule of Bankruptcy Procedure 7030, provides that

> If requested by the deponent or a party...the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes...

As UVCC's counsel requested Debtor review the transcript, Debtor was required to make any changes or to certify that the transcript was correct within thirty days of May 19, 2003. Debtor failed to do so. Additionally, Federal Rule of Civil Procedure 37(a)(4)(A), made applicable to bank-

---

6. Cross examination of the appraisers was to be limited to their methodology only based upon the Stipulation of the parties that Debtor would not offer any appraisal or valuation report into evidence, see August 20, 2003 Order, CM/ECF Docket # 63, and this Court's Order precluding Debtor from providing any evidence as to the value of STK's assets, based

upon Debtor's failure, not only to provide appraisal reports, but also to *inform* UVCC that they would not be obtaining same.

7. See September 11, 2003 Order on motion in limine Precluding Debtor from Introducing Evidence, CM/ECF Docket # 67.

ruptcy proceeding through Federal Rule of Bankruptcy Procedure 7037 states that

> ...if the motion is granted or if the disclosure or requested discovery is provided after the motion is filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion...to pay the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action.

Attached to UVCC's motion in limine as exhibits A, C, D and G are correspondence sent to Debtor's counsel seeking compliance from Debtor with the discovery stipulation, evidencing that the requisite good faith effort was made to obtain a copy of the Debtor's signed deposition transcript and responses to the unanswered questions posed at Debtor's deposition. UVCC should not have to bear the economic expense of Debtor's failure to comply with the Federal Rules of Bankruptcy Procedure. *See Baker v. Ace Advertisers' Serv.,* 134 F.R.D. 65, 74 (S.D.N.Y.1991) (Proper sanction for failure to sign deposition transcript is that deponent is deemed to have waived signing of the transcript, which is considered to be an accurate recital of the testimony; the party refusing to sign the transcript was required to pay the movant the costs associated with the motion seeking to compel deponent to sign the deposition transcript).

On August 19, 2003, Debtor was ordered to provide UVCC with the information requested at the Debtor's May 19, 2003 deposition. No objection to the propounded questions were brought to this Court for a ruling nor was a protective order sought pursuant to Federal Rule of Civil Procedure 26(c), made applicable to this bank-ruptcy proceeding through Federal Rule of Bankruptcy Procedure 7026, in connection with the request for this information. Debtor's counsel represented at the August 19, 2003 hearing that the only information he would seek to admit at trial would be the amount of Debtor's personal investment in STK. Yet counsel for Debtor failed to provide UVCC's counsel with even this information within the 48–hour period specified in this Court's Order entered on August 21, 2003.

Federal Rule of Civil Procedure 37(a)(2)(B) provides

> If a deponent fails to answer a question propounded or submitted under Rule 30 or 31...the discovering party may move for an order compelling answer ...in accordance with the request. The motion must include a certification that the movant has conferred in good faith...with the person failing to make discovery in an effort to secure the information or material without court action...(4) if the motion is granted...the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion...to pay the moving party the reasonable expenses incurred in making the motion, **including attorney's fees**...

Debtor failed to answer the questions propounded at the deposition despite opposing counsel's repeated requests for the information dated June 9, 2003, July 8, 2003 and August 12, 2003, and this Court's August 18, 2003 Order directing he do so. Therefore, Upper Valley's motion seeking attorney's fees and expenses in connection with that portion of their Motion in Limine which deals with the deposition transcript and information to be provided pursuant to Schedule A thereto was granted by this Court. Debtor was precluded from offering any evidence as to the amount of the

Debtor's personal money in STK at the Evidentiary Hearing of this matter because of Debtor's failure to supply the required information to opposing counsel as ordered by this Court. *See Baker*, 134 F.R.D. 65, 71. ("Rule 37(b)(2) of the Federal Rules of Civil Procedure provides for the imposition of sanctions when a party fails to comply with a discovery order of the court. The sanctions authorized are any that are 'just' in the circumstances, including those of great severity such as the preclusion of evidence...").

The Court believes an award of attorney's fees is appropriate in this case, in light of the Debtor's consistent failure to meet agreed-upon and court-ordered discovery deadlines, which significantly delayed the resolution of this case and placed opposing counsel and this Court at a distinct disadvantage.

### B. The Absence of a Discovery Stipulation

 Debtor makes much of the fact that, initially, there was no formal discovery stipulation entered into in this case. However, in some circumstances, "the principles of equity and justice may render an informal stipulation effective," such as in cases where the stipulation has been relied on by a party so that estoppel to insist upon formal requirements may be appropriate. *See Monaghan v. SZS 33 Assoc.*, 875 F.Supp. 1037, 1042 (S.D.N.Y. 1995) (Sweet, J.) (A court will enforce an oral stipulation if the party who seeks enforcement shows that he or she acted in good faith reliance upon that stipulation); *see also generally* F.T. Chen, *Effectiveness of Stipulation of Parties or Attorneys, Notwithstanding its Violating Form Requirements*, 7 A.L.R.3d 1394 (1966). This is such a case. UVCC's counsel memorialized the agreement regarding discovery in a letter sent to the Court and Debtor's counsel. In good faith reliance on opposing counsel's representation that they would obtain an appraisal, UVCC's counsel had a complete appraisal done of STK Petroleum's assets. It should be noted that UVCC did not bear the burden of proof on the issue of the value of STK's assets. In his objection to UVCC proofs of Claim, Debtor argued, and UVCC denied, that UVCC had seized STK's assets, and that UVCC's claim should be reduced, or disallowed because of the value of those assets. It is well settled that the party objecting to a proof of claim has the burden of coming forward with *sufficient evidence* rebutting the validity of a properly filed proof of claim. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–174 (3rd Cir. 1992); *In re Kahn*, 114 B.R. 40, 44 (Bankr.S.D.N.Y.1990)(Schwartzberg, J.). The Debtor bore the burden of putting forth *some* evidence that would refute at least one of the allegations that is essential to UVCC's claims' legal sufficiency. *See Allegheny*, 954 F.2d at 173–174. Debtor's testimony as to the amount of his personal investment in STK might have sufficed, if he had provided same, but he did not—he failed to answer the questions propounded at the deposition, and failed to supplement his responses despite numerous requests and a court order to do so. Debtor made the *allegation* that the assets of STK were seized and their value should satisfy UVCC's claims against Debtor, but did not obtain any cognizable evidence that the assets had any value. UVCC procured professional asset appraisals, having been told by Debtor that he would obtain a valuation of STK's assets and anticipating that Debtor would in fact seek to introduce that evidence at a subsequent hearing. When STK's appraisal reports were not forthcoming, UVCC's counsel contacted Debtor's counsel on several occasions in an attempt to resolve the issue before seeking Court intervention. At no time prior to

the appraisal deadline did Debtor or his counsel inform UVCC that they had no intention of obtaining an appraisal in response to these communications seeking discovery compliance.[8] The Court finds that UVCC would not have sought appraisals of the assets absent Debtor's objection, because UVCC maintained from the beginning that no turnover of assets occurred. Had UVCC, or the Court for that matter, known that Debtor was not going to seek appraisals, there would have been no need to adjourn the Evidentiary Hearing from June, 2003 until August, 2003. The Court therefore has held Debtor and his counsel to their agreement with UVCC's counsel to obtain appraisals, and the failure to do so, and the failure to provide information during discovery with regard to Debtor's personal investment in STK, has lead this Court to preclude Debtor from offering any particulars as to the value of STK's corporate assets.

## II. THE PRE–HEARING BRIEFS AND PROCEEDINGS

UVCC, in its Pre–Trial Memorandum of Law, ECF Docket # 71, advanced several arguments in support of its Lift Stay Motion. Principally, UVCC alleged that it was not adequately protected because Debtor had not made any payments to UVCC since the filing of his bankruptcy petition in November 2002. Neither had Debtor provided UVCC with a replacement lien, additional lien or other equiva-

lent value despite the fact that the entire principal indebtedness on the Mortgage was due and owing as of October, 2002, prior to Debtor's bankruptcy filing. Furthermore, UVCC argued, under § 362(d)(1), an equity cushion alone is not sufficient to defeat a lift stay motion in a case such as this, where Debtor had filed the bankruptcy 10 months earlier, no reorganization plan had been filed, no disclosure statement provided and operating statements have not been filed for months at a time.[9] UVCC also stated that the approximately $97,000 they received from Champion Mortgage was used to pay off the unsecured Personal Notes and not used to pay off the indebtedness that was secured by the Mortgage.

In his pretrial Memorandum of Law in Opposition to the Motion of Upper Valley Commercial Corp., ECF Docket # 73 and Objection to Claim # 8, ECF Docket # 72, Debtor argued that the "rule of equity" required UVCC to marshal the assets of STK before seeking to satisfy STK debt out of Debtor's real property. Debtor also contended that the six-year statute of limitations on the demand notes at issue had expired and UVCC's claims were time barred. Debtor advanced in the alternative that the claims had been paid in full by UVCC's seizure of STK assets, in that the value of the assets exceeded the amount of UVCC's claims. The Debtor cited to UCC 9–501, 9–504 and 9–505,[10]

---

8. On July 22, 2003, UVCC counsel sent correspondence to Debtor's counsel seeking copies of Debtor's appraisal reports, which communication indicated that the appraisals were due on July 14, 2003 and informed Debtor that the Debtor's continued failure to provide UVCC counsel with appraisals was causing UVCC prejudice. See UVCC's motion in limine, Exhibit G. It is apparent at the time that this correspondence was sent, UVCC still fully expected Debtor to obtain his own appraisals of STK's assets.

9. At the time of the October 9, 2003 hearing, Debtor had filed operating statements for the months of November 2002—May 2003, all docketed on CM/ECF on June 27, 2003. No further operating statements have been submitted by Debtor at the time of the writing of this opinion.

10. Debtor cited to Article 9 of the Uniform Commercial Code in his September 26, 2003 memorandum of law. Debtor's counsel was relying on New Hampshire law, and in particular N.H. RSA 382-A:9–610, although the

arguing that as UVCC had seized and operated STK without making an effort to dispose of the collateral in a commercially reasonable manner, UVCC had elected a retention option and UVCC had no deficiency claim against Debtor. Debtor also alleged that UVCC was adequately protected by a large equity cushion.

At the October 3, 2003 hearing on the motion in limine, the parties were instructed to brief any possible waiver of the statute of limitations defense. Instead, the parties further briefed the UCC Article 9 argument. The parties then contacted chambers and sought an expedited hearing on the UCC issue on October 8, 2003, the day before the Evidentiary Hearing was scheduled to be held. At the October 8, 2003 hearing, the Court ruled against Debtor on the Article 9 argument and the marshaling of STK's assets issue, for the reasons more fully discussed below.

The evidentiary hearing was held on October 9, 2003. The Court heard the testimony of Edward Patten, chairman of UVCC's board of directors, and the Debtor. Debtor's testimony consisted of a litany of personal and professional indignities Debtor alleges UVCC, in the guise of Edward Patten, inflicted upon him. Much of what Debtor testified to had little relevance to the issues of law or fact in controversy. Evidently, Debtor has suffered significant financial losses and holds the owners of UVCC responsible for these setbacks. Nothing uncovered at the evidentiary hearing gave this Court any indication that these setbacks were precipitated by anything other than Debtor's own personal and corporate financial management skills.

## III. DEBTOR'S OBJECTIONS TO UVCC's PROOFS OF CLAIM

### A. Each Parties' Burdens of Proof on an Objection to Claim

UVCC has filed two Proofs of Claim in this Chapter 11 proceeding; a secured claim for $100,000.00 ("Claim No. 7") and an unsecured claim for $3,065,723.10 ("Claim No. 8").[11]

 "Pursuant to 11 U.S.C. § 502(a), a properly filed proof of claim is deemed allowed unless a party in interest objects...such allowance compels the objecting party to go forward and produce sufficient evidence to rebut the claimant's *prima facie* case...if the objecting party rebuts the claimant's *prima facie* case, it is for the claimant to prove his claim, not for the objector to disprove it..." *See In re Kahn,* 114 B.R. 40, 44 (Bankr.S.D.N.Y. 1990) (Schwartzberg, J.) (internal citations omitted); *see also In re Leatherland Corp.,* 302 B.R. 250, 258–259 (Bankr. N.D.Ohio 2003). A party in interest may overcome the presumptive validity of a proof of claim by "negating the *prima facie* validity of the filed claim...the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency..." *In re Allegheny Int'l, Inc.,* 954 F.2d at 173–174 (3rd Cir.1992). Once the presumption is overcome with respect to the validity and amount of the proof of claim, the claimant must demonstrate by a preponderance of the evidence

---

parties did not provide the Court with this choice of law information until a case conference held on October 7, 2003, two days before the evidentiary hearing. Debtor's counsel did not cite to a specific New Hampshire statute for this Court's reference until his post-trial

brief submitted to this Court on November 10, 2003.

11. As the parties have stipulated that Claim # 8 contains corporate obligations not personally guaranteed by Debtor, an amended proof of claim is to be filed.

the extent and validity of its claim. *See In re Chateaugay Corp.*, 154 B.R. 29, 32 (Bankr.S.D.N.Y.1993)(Lifland, C.J.).

Debtor has objected to both of UVCC's claims using identical arguments against each proof of claim, notwithstanding that Claim No. 7 evidences a secured claim for $100,000, and Claim No. 8 represents an unsecured claim in the amount of $3,065,723.10. Briefly, Debtor argues that Debtor is the guarantor of the original obligations of STK, of which David Patten and Alvin Fadden are corporate principals; as the Pattens and Mr. Fadden are corporate principals of both STK and UVCC, there is no incentive for them to seek payment from themselves and it is therefore incumbent upon this Court to force UVCC to seek payment from the assets of STK prior to allowing them to enforce UVCC's secured interest in Debtor's premises. Debtor further alleges that New York's Civil Practice Law and Rules § 213(4) six-year statute of limitations governs the demand notes for which Debtor is guarantor, and such period had expired. Debtor also argues that UVCC "seized" STK's assets and ongoing business, the value of which should be applied to expunge Debtor's obligations to UVCC. Fi-

nally, Debtor advances that "[p]ursuant to Uniform Commercial Code Section 9–505, Upper Valley has retained the collateral (the assets and business of STK) in full satisfaction of its claim and may not seek a deficiency claim against Mr. King." [12]

UVCC, in opposition to Debtor's Objections, states that the equitable doctrine of marshaling is inapplicable to the instant case because one of the elements of such doctrine is not satisfied. Further, UVCC advances, the Statute of Limitation began to run anew at the time of each partial payment on the demand notes. Debtor's reliance on Uniform Commercial Code § 9–505 is misplaced, UVCC reasons, because STK is still an independent, operating entity in possession of its own assets.

The Court will address each of these arguments in turn before dealing with UVCC argument in favor of lifting the automatic stay. [13]

### B. The Turnover of Corporate Assets to UVCC

■ Debtor objects to Claims No. 7 and No. 8 on the grounds that UVCC has "repossessed" STK corporate assets and seized STK's stock, the value of which must be used to diminish UVCC proofs of claim if not extinguish them altogether.

---

**12.** See Debtor's Supplemental Objection to Claim # 7, CM/ECF Docket No. 69, ¶ 17, and Debtor's Objection to Claim # 8, CM/ECF Docket No. 72, ¶ 16.

**13.** Debtor's arguments with regard to Claim No. 8 pursuant to UCC § 3–115 and the improper compounding of interest, were not made by Debtor in his pre-trial briefs or Debtor's objection to claims. Neither Debtor or UVCC made a motion, pursuant to FRBP 7015(b), to conform the pleadings to the evidence at the end of the Evidentiary Hearing. Debtor did advance in the Joint Pre–Trial order that an issue of law to be considered by this Court at the Evidentiary Hearing was UVCC compliance with "its obligations under the UCC." The broad phrasing of this legal

issue that could permit the Debtor to make any arguments with regard to the UCC at trial completely defeats the purpose of entering into a joint pre-trial order. The purpose for so doing is to narrow the issues to be tried to allow an informed adjudication on the merits. It is not the responsibility of UVCC's counsel or this Court to search out each and every possible UCC argument that Debtor might conceivably make and consider same with regard to the outcome of this case. Rather, it was Debtor's responsibility to specifically delineate each UCC argument that he intended to advance at trial. In light of his failure to do so in the Joint Pre–Trial order, this Court will be guided by the arguments made by the parties' pre-trial submissions.

"One who possesses collateral for a loan in default cannot walk away with the collateral if it is worth more than the debt." *See Bezanson v. Fleet Bank–NH*, 29 F.3d 16, 20 (1st Cir.1994). UVCC counters that STK remains an independent operating corporate entity with separate by-laws and separate bank accounts, and thus no "seizure" or "repossession" of STK's assets has occurred.

The Court finds that UVCC did not seize or repossess STK's assets when it accelerated STK corporate debt and in essence, ousted Debtor from STK. The Court likens the Debtor's "turnover" argument as analogous to an "alter ego" argument seeking to pierce the corporate veil and hold a parent corporation liable for the actions of its subsidiary. That is, Debtor's turnover argument is essentially that UVCC is really in control of STK and is operating the corporation; STK has no independent existence from UVCC and thus, UVCC has "repossessed" the assets of STK.

> "The fact that a corporation owns all or the majority of the stock of another corporation does not in itself destroy the identity of the latter as a distinct legal entity...and the fact that stockholders, officers or directors in two corporations may be the same persons does not operate to **destroy the legal identify of either corporation**, nor does the fact that one corporation exercises a controlling influence over the other through the ownership of its stock or through the identity of stockholders make either the agent of the other or *merge the two corporations into one...*" 18 Am. Jur.2d *Corporations* § 57 (2003)(emphasis supplied).

Debtor bore the burden of coming forward with some evidence that UVCC had taken control of STK in October, 2002 such that the value of STK's assets should have reduced UVCC's claims. The Acceleration Notice, Debtor's Exhibit "D," does state that UVCC "demands" possession STK collateral. Debtor's remaining 31 shares of stock were transferred to UVCC concurrent with the Acceleration Notice and therefore UVCC became a minority shareholder in STK. There was no evidence presented at the evidentiary hearing that UVCC actually came into possession of the remaining corporate assets; STK did not "become" UVCC in any cognizable manner. Aside from the fact that UVCC came into control of STK stock, the parties have identified no act or event which is tantamount to a "seizure" or "repossession." The parties stipulated in their Joint Pretrial Order,[14] however, that David Patten and Alvin Fadden owned 69% of STK corporate stock in October, 2002, prior to the debt acceleration. Edward Patten testified without contradiction that Fadden and David Patten retain their ownership interests in STK, and that all corporate formalities are observed between UVCC and STK Petroleum. Thus no change of ownership of STK occurred upon the acceleration of the corporate debt in 2002. The testimony also revealed that STK Petroleum continues as an ongoing enterprise, and maintains separate bank accounts and bylaws. Testimony given by Debtor and Edward Patten reveals that UVCC's practice with regard to collection on the Corporate Notes continues to date exactly as it did prior to the October, 2002 acceleration.

Debtor's counsel: Q: Thank you, Mr. Patten. Do you continue to make—does STK continue to make payments on the debt?

Mr. Patten: A: Yes, they are making payments now on the debt, yes.

The Court: Q: On a timely basis?

---

14. CM/ECF Docket # 87.

Mr. Patten: A: No, it's whatever they have left in their bank account after paying all the bills, then they will supply Upper Valley with the money.

Tr., p. 76.

Debtor's counsel: Q: Well, Mr. King, during STK's relationship with Upper Valley, was STK making regular weekly payments as called for by the notes?

Debtor: A: No, we were not.

Debtor's counsel: Q: Was—go ahead, I'm sorry?

Debtor: A: I'm sorry. Mr. Patten was adamant about G & S Energy paying its gas bill first, paying all our vendors, all our tax bills, every bill, he was absolutely adamant about getting paid (sic) before we paid Upper Valley note (sic). And if there was any money left, the we would transfer that money to Upper Valley.

Tr., p. 140–141.

Edward Patten testified at the Evidentiary Hearing that no credit had been given for the assets because UVCC had not taken possession of the assets.[15] Debtor's evidence shows no more than that UVCC became a minority shareholder of STK, and that the board of directors of both UVCC and STK consist of the same individuals. Furthermore, the Court can see no legal significance in the fact that Edward Patten and David Patten are father and son. STK is currently owned by the same majority shareholders as in October, 2002 and interacts with UVCC in the same manner as when Debtor was at the helm of STK. STK continues to operate in its former capacity. UVCC has not repossessed the assets of STK. No turnover occurred.

Even had a turnover of the assets occurred in October, 2002, however, the Debtor's Objection to UVCC's claims, based on UVCC's failure to credit Debtor with the value of STK assets, would nonetheless fail. Debtor has not met his burden to overcome the presumptive validity of UVCC's proofs of claim by "negating the *prima facie* validity of the filed claim...the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency..." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–174 (3rd Cir.1992). Debtor failed to obtain an appraisal of STK's assets to show that their value would diminish the amount owed to UVCC under circumstances that led this Court to preclude Debtor from offering testimony as to the value of STK. The Debtor has therefore failed to show that UVCC's claim amount would be reduced by the value of STK's assets, let alone satisfied or invalidated, because Debtor has not shown what STK's assets were worth.

Assuming, *arguendo*, that the Debtor had overcome the *prima facie* validity Claim Nos. 7 and 8, the burden would then shift to the claimant, UVCC, to demonstrate by a preponderance of the evidence the extent and validity of its claim. *See In re Chateaugay Corp.*, 154 B.R. 29, 32 (Bankr.S.D.N.Y.1993)(Lifland, C.J.). In fact, UVCC did perform appraisals of the corporate assets at issue, which were submitted to this Court together with UVCC's motion in limine. UVCC took the position at the Evidentiary Hearing that the appraisers' testimony was not necessary in that Debtor had failed to submit sufficient evidence to rebut the *prima facie* validity

---

**15.** Debtor's counsel offered into evidence at trial Mr. Patten's deposition testimony which contradicted this statement. The Court has considered this contradictory testimony with regard to Mr. Patten's credibility.

of the claims at issue, and thus the burden of proof never shifted to UVCC. The Court agrees with UVCC that the burden never shifted to UVCC to prove that the value of the assets and any credit therefore should be applied to STK's debt.

### C. The Extent of Debtor's Liability on the Guarantee

▮▮ The parties have stipulated that New Hampshire law applies to the construction of the guarantee and notes executed by the parties. Debtor argues in his post-trial brief that a guarantor's liability on a debt is limited to the liability of the principal obligor, citing for this proposition the case of *Howard v. Hunt,* 57 N.H. 467 (1876). *See* Tr., p. 3. Under New Hampshire law, a guarantor's liability on a debt depends on upon the terms of the contract. *See BankEast v. Michalenoick,* 138 N.H. 367, 369, 639 A.2d 272 (1994); *Reconstruction Fin. Corp. v. Faulkner,* 101 N.H. 352, 143 A.2d 403, 406 (1958). "The interpretation of a contract is a question of law to be determined by focusing on the language of the written contract, as it reflects the intent of the parties." *See BankEast,* 138 N.H. at 369, 639 A.2d 272. The Court turns, then, to an examination of the guarantee agreements entered into between Debtor and UVCC.

Each guarantee agreement reads as follows:

NOTICE TO CO–SIGNER; YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

Borrower has read and fully understands the terms and conditions contained on the face of this Note and the 3 pages of general conditions following this Note; paragraphs 1 through 6.

The general conditions referenced in the guarantee agreement provide in pertinent part:

1. Borrower hereby...(ii) consents to (b) release, substitution, or exchange of any security for the payment hereof or the failure to act on the part of UVCC or any indulgence shown by UVCC, from time to time and in one or more instances (without notice to or further assent from any of the Obligors), (iii) agrees that no such action, failure to act or failure to exercise any right or remedy on the part of UVCC shall in any way affect or impair the obligations of Borrower or any Obligors or be construed by UVCC as a waiver of, or otherwise affect, any of UVCC's rights under this Note, under any endorsement or guaranty of this Note or under any document or instrument evidencing any security for payment of this note...

▮▮ Debtor contends that the default of STK under the Corporate Notes was a "sham," because UVCC had made no attempt to collect the secured debt from STK's assets. Debtor reasons that because the principals of STK, David Patten, Edward Patten and Alvin Fadden, are also the principals of UVCC, it would be unjust to seek payment from Debtor personally before seizing the assets of the STK and selling them to satisfy STK indebtedness to UVCC. Debtor explicitly waived this argument, however, in the guarantee agreement he entered into with UVCC. In signing the guarantee agreement, Debtor agreed that UVCC's "failure to exercise any rights" would not "affect or impair the obligations of...any Obligors..." As discussed more fully below, STK continues to make payment on its Corporate Notes;

however, the entire amount due was demanded in October, 2002. Pursuant to the terms of the guarantee agreement, then, UVCC is not required to seize and sell STK's assets prior to exercising its rights under Debtor's guarantee or the Mortgage; the agreement merely states that the guarantor is liable if the borrower does not pay. Debtor guaranteed payment of the Corporate Notes on demand. Demand was made in October, 2002. STK has not paid the entire amount due on the Notes to date, and thus, Debtor's obligation to pay on his personal guarantee is triggered.

The Mortgage is security for the promissory notes that Debtor guaranteed. No deficiency judgment need be sought prior to enforcement of UVCC's security interest because the Mortgage is collateral for a loan that has been accelerated and was due and owing as of October, 2002. The Mortgage provides that failure to make a payment within 15 days of the date it was due constitutes a default under its terms. Edward Patten testified that a default occurred because of STK's failure to make timely payments under the subject notes and that STK did not cure the default in a timely manner. *See* Evidentiary Hearing Transcript at p. 29. Debtor did not deny that payments were made late or that a default occurred. *See* Evidentiary Hearing Transcript p. 140, 1. 23–25, p. 141, 1. 1. Thus, as of October, 2002, UVCC was entitled to foreclose on its interest in Debtor's Real Property.

Precisely how many notes Debtor personally guaranteed was not resolved at the evidentiary hearing on the Lift Stay Motion held by this Court on October 9, 2003. Counsel for both parties stipulated that a

number of Corporate Notes included in Claim No. 8, were not guaranteed by Debtor and should not have been included. *See* Transcript of Hearing on October 9, 2003, at p. 84–85. Counsel for UVCC was not able to estimate on the hearing date what figure Debtor actually guaranteed; however, on November 21, 2003 this Court received correspondence from UVCC indicating that Debtor personally guaranteed $2,790,913.82 in Corporate Notes and that an amended proof of claim would be filed. Counsel for Debtor has indicated, by means of a letter dated December 2, 2003, that he will not stipulate to the $2,790,913.82 figure and will object to any amended proof of claim filed by UVCC. The Court awaits UVCC's amended proof of claim and Debtor's promised objection to determine the exact amount of guaranteed debt.[16]

### D. Marshaling of STK's Assets

The Debtor argues that UVCC should be required to "marshal" the assets of STK before seeking to satisfy STK corporate debt from the collateral security mortgage. As discussed above, however, the guarantee agreement specifically waives Debtor's right to require any such marshaling of assets. That is, Debtor agreed that UVCC's "failure to exercise any right," *i.e.* to repossess and dispose of STK's assets prior to seeking satisfaction out of the Premises, did not constitute a waiver of UVCC's right to seek payment under the guaranty and security agreement—the Mortgage. An examination of the marshaling doctrine, however, reveals that it is not applicable in this instance in any case. Marshaling is an equitable doctrine which requires "a senior creditor,

---

**16.** The Court also requires an accounting of the payments made by STK on the Corporate Notes in the interim. The Court further requires information with regard to whether the payments made by STK since October, 2002 were applied to debt guaranteed by Debtor or applied to that portion of the Corporate debt that the parties agreed was not subject to the Debtor's personal guarantee.

having two funds to satisfy his debt, to resort first to the one fund which is not subject to the demand of a junior creditor of the common debtor, to avoid the inequity that would result from an election of the senior creditor to satisfy its demand out of the only fund available to the junior creditor from any satisfaction." BLACK'S LAW DICTIONARY 973–974 (6th ed.1990). Marshaling is a doctrine which is designed to protect junior creditors. "Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a *junior lienor* or a creditor having less security." *See Meyer v. U.S.*, 375 U.S. 233, 237, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963)(emphasis supplied). A party seeking to employ the doctrine must show that three elements are present: "1) Two or more creditors of the same debtor; 2) multiple funds belonging to that debtor and 3) one creditor having the ability to resort to all of the funds." *See Walther v. Bank of New York*, 772 F.Supp. 754, 767 (S.D.N.Y.1991). Debtor admits in his pre-trial memorandum of law that "technically, Mr. King does not control two funds." Debtor's Memorandum of Law, p. 5, CM/ECF Docket # 73.[17] In fact, the requirement of two funds belonging to the same debtor "is not met where the two funds sought to be marshaled are held separately, such as by the corporation and its shareholder." *Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223

B.R. 275, 287 (Bankr.S.D.N.Y.1998)(Brozman, C.J.). This is so even if the shareholder guaranteed the debt. *See Fundex Capital Corp. v. Balaber–Strauss (In re Tampa Chain Co., Inc.)*, 53 B.R. 772, 778 (Bankr.S.D.N.Y.1985) (Buschman, J.). As Debtor does not control two funds out of which UVCC could seek to satisfy its claim, the Debtor's marshaling argument must fail.

### E. The UCC Article 9 Argument

The Court holds that Debtor's arguments relating to New Hampshire UCC § 9–610 are unavailing as to the Mortgage. In essence, the Debtor's argument is that under New Hampshire Law, when a creditor takes collateral and does not dispose of it pursuant to UCC § 9–610, the collateral is deemed to be taken in full satisfaction of the debt and thus the creditor is barred from maintaining any action for a deficiency judgment. *See* Debtor's Memorandum of Law, Dated October 7, 2003, at pp. 3–4. As UVCC took possession of "the collateral" (the collateral being, apparently, STK's assets), and did not dispose of it in a commercially reasonable manner as required by the Uniform Commercial Code, Debtor argues that the Court must dismiss what Debtor refers to as UVCC's claim for a "deficiency judgment." *Id.* at 4. This argument will be addressed as to each of UVCC's claims notwithstanding the fact that the Court holds that no seizure or

17. Debtor makes an oblique reference to a possible cross claim against STK parenthetically to the admission that Debtor does not technically control two funds. The reference does not overtly state that the cross claim would be a second fund belonging to Debtor and would therefore satisfy the second element of the marshalling doctrine. At the October 8, 2003 hearing, Debtor argued, explicitly for the first time, that if Debtor were liable for all the corporate debt, then Debtor would have claims against Alvin Fadden and

David Patten for contribution on the guarantee. This potential claim for contribution, which would not come into existence until such time as Debtor actually paid the guaranteed debt, would theoretically be the second fund belonging to the Debtor. As this issue was not briefed by the Debtor prior to the October 8, 2003 hearing save for an indirect reference in a parenthetical clause, and not supported by any legal authority provided by the Debtor, it has not been passed upon by the Court.

repossession of STK's assets has actually occurred.

### i. The Mortgage

 The Debtor executed the Mortgage *securing* STK's indebtedness to UVCC. The Mortgage relates to Debtor's residential property in the town of Milan, New York and is a separate and distinct document from the guarantee instruments. UVCC is within its rights to seek payment from that collateral without sale of STK's assets in a commercially reasonable manner because in so doing, UVCC would not be seeking to satisfy any deficiency, because "[a] deficiency judgment is the finding of personal liability upon a debtor for the unpaid balance of a secured debt *after disposition* of the collateral fails to provide proceeds sufficient to satisfy the underlying debt." *See In re Gerber*, 51 B.R. 526, 529 (Bankr.D.Neb.1985)(emphasis supplied). "[A] proceeding for a deficiency judgment is an attempt to recover something *more and distinct* from the security provided by the debtor." *Chittenden Trust Co. v. Andre Noel Sports*, 159 Vt. 387, 396, 621 A.2d 215 (1992)(emphasis added). The Mortgage at issue herein was given by Debtor as security for STK corporate debt. A deficiency would result if the total value of the collateral, *i.e.* the Mortgage and the assets of STK, did not satisfy the indebtedness owed to UVCC. In other words, when UVCC proved that it was entitled to payment on STK's corporate debt, it was permissible to satisfy that debt out of the collateral which it bargained for: STK assets and/or the *collateral security* Mortgage. *See also Clarkeies Market LLC v. Associated Grocers of New England, Inc. (In re Clarkeies Market)*, 2003 WL 193686 * 11 (Bankr.D.N.H.2003)(denial of unsecured deficiency claim arising from obligations associated with collateral kept in strict foreclosure option under N.H. RSA 382–A:9–505(2) does not affect the validity or perfection of any security interest which secured creditor may hold in other property of the Debtor).

### ii. UVCC's Unsecured Claim

██ Once UVCC has satisfied STK's obligations out of its assets and the collateral security mortgage, any shortfall remaining would be a *deficiency,* and the requirements of Article 9 of the Commercial Code would theoretically apply to any resulting deficiency. "[T]he claim against the bankruptcy estate constitutes an 'available judicial procedure for purposes of § 9–501, which makes the [Debtor's] § 9–505 argument an affirmative defense...the burden does not shift back to [UVCC] to prove that it did not retain the collateral in full satisfaction of [STK's] debt, the burden remains on the [Debtor] to prove that [UVCC] did retain collateral in full satisfaction of that debt." *Notinger v. Auto Shine Car Wash Systems, Inc. (In re Campano)*, 293 B.R. 281, 287 (D.N.H. 2003). Therefore, it would not be UVCC's burden to prove that retention of the collateral was commercially reasonable and not in full satisfaction of STK's debt; the burden rests on the Debtor to "establish full satisfaction, not [UVCC] to disprove it." *Id.* at 288.

In ruling on Debtor's UCC Article 9 argument, the Court held that because UVCC did not provide written notice of its intention to retain STK's assets in full satisfaction of the obligation, as required by N.H. RSA 382–A:9–505(2), Debtor's strict foreclosure argument must fail. The New Hampshire District Court has noted that "the New Hampshire Supreme Court has not yet read the notice requirement out of RSA 382–A:9–505(2)." *Notinger v. Auto Shine Car Wash Systems, Inc. (In re Campano)*, 293 B.R. 281, 288 (D.N.H.

2003). *See also* N.H. RSA 382–A:9–620 Official Comment No. 5:

> "Secured Party's Agreement; No 'Constructive' Strict Foreclosure...to ensure that the debtor cannot unilaterally cause an acceptance of collateral...acceptance does not occur unless...the secured party consents to the acceptance in an authenticated record or sends to the debtor a proposal...for this reason, a mere delay in collection or disposition of collateral does not constitute a 'constructive' strict foreclosure. Instead, delay is a factor relating to whether the secured party acted in a commercially reasonable manner for purposes of § 9–610."

■ Debtor's reliance on *Lamp Fair, Inc. v. Perez–Ortiz*, 888 F.2d 173 (1st Cir. 1989) is therefore misplaced as the First Circuit was interpreting Connecticut law in that case, and it is clear that under New Hampshire law, which the parties have stipulated applies here, a statutorily required notice must be sent by the secured creditor to Debtor before strict foreclosure is accomplished.

■ In order to obtain an unsecured "deficiency" judgment,[18] however, UVCC would required by N.H. RSA–A:9–610(a) to dispose of the collateral in a commercially reasonable manner. "[I]f a secured party does not proceed under Section 9–620 and holds collateral for a long period of time without disposing of it, and there is no good reason for not making a prompt disposition, the secured party may be determined not to have acted in a 'commercially reasonable' manner." *See* N.H. RSA–A9:610, Official Comment No. 3, *Time of Disposition. See also Clarkeies Market*, 2003 WL 193686 at * 11 (Bankr. D.N.H. Jan. 22, 2003)(Secured creditor who had not sold collateral at a public or private sale, but instead continued to run debtor's business, was not entitled to a deficiency judgment under New Hampshire law). Unless UVCC sold the collateral at a public or private sale, or showed a "good reason" for not making a prompt disposition, it would not be entitled to a deficiency judgment under N.H. RSA–A:9–610 and would therefore be barred from bringing a claim for the balance of the personally guaranteed indebtedness. In this case, however, the Court has found that no turnover of substantially all of STK's assets occurred. As in the *Campano* case, *supra*, the Court finds that UVCC did not seize "substantially all" of STK's assets; rather, they selectively exercised their rights under the security agreement and transferred the remaining STK shares

---

18. Debtor filed an objection to Claim No. 8 for Debtor's unsecured indebtedness on September 25, 2003, and scheduled the hearing on the Objection to occur simultaneously with the October 9, 2003 evidentiary hearing. At the October 3, 2003 final pre-trial conference, the parties stipulated to a waiver of the 30–day notice period required by Federal Bankruptcy Rule 3007. Thereafter, on October 7, 2003, the parties delivered briefs to the Court at 3:00 p.m. and requested an expedited hearing on the New Hampshire UCC Article 9 argument be held on October 8, 2003. The Court reiterates that Debtor's consistent failure to meet deadlines has placed the Court at a considerable disadvantage in this litigation. Debtor requested an expedited hearing the day before the evidentiary hearing on the issue of the Article 9 argument because "by hearing this narrow issue first, the need for a lengthy trial may be reduced to a factual hearing with a very limited duration," notwithstanding Debtor's failure to meet the August 11, 2003 deadline for motions in limine. Debtor also failed to provide promised discovery resulting in a preclusion order. Finally, Debtor not only did not obtain appraisals, for which purpose the evidentiary hearing in this matter was adjourned for months, but also did not inform UVCC's counsel and this Court of their intention to forgo appraising STK assets until after the agreed upon deadline for obtaining same.

of stock held by Mr. King to UVCC. *See Campano*, 293 B.R. at 289 (bankruptcy court's factual determination that secured creditor did not seize substantially all corporate assets defeated strict foreclosure argument). No deficiency judgment need be sought by UVCC to enforce its rights under Debtor's guarantee, because UVCC did not seize substantially all of STK's assets. The Court also finds that in attempting to foreclose on the Mortgage UVCC is not seeking a "deficiency" against Debtor; instead UVCC is satisfying the debt owed out of the collateral it bargained for. Thus the UCC Article 9 arguments advanced are not applicable to the Mortgage, Claim No. 8 and Claim No. 7.

### F. The Statute of Limitations Defense

 Debtor argues that a substantial portion of UVCC's claim is barred by the six year Statute of Limitations set forth in New York Civil Procedure Law and Rules Section 213(4).[19] The statute of limitations on demand notes begins to accrue upon the date of execution of the demand notes. *See Shelley v. Dixon Equities*, 300 A.D.2d 566, 752 N.Y.S.2d 542 (2d Dept.2002); *Brae Asset Fund v. Robson*, 1997 WL 124129 (S.D.N.Y.). Partial payments can revive the obligation. *See Grant v. Marshall*, 307 A.D.2d 274, 762 N.Y.S.2d 280 (2d Dept.2003). The partial payment must be made under circum-

stances from which a promise to honor the obligation may be inferred. *See Roth v. Michelson*, 55 N.Y.2d 278, 281, 449 N.Y.S.2d 159, 434 N.E.2d 228 (1982). In reviewing STK's payment history on the Corporate Notes, *see* UVCC Trial Exhibit # 23, it is apparent that some of the payments made by STK are "catch up payments." In other words, STK would miss payments for several weeks and then make large payments to bring the account current. Consider, for example, the payment made by STK on December 9, 1996, within a six-year period of UVCC's October, 2002 Acceleration Notice. STK failed to make weekly payments of $3,409.00 from September 30, 1996 through November 27, 1996. On December 9, 1996, STK made a payment of $42,468.00. Similarly, after periodically missing several weeks of payments at a time during the period between February, 1997 and April, 1998, STK made a large payment of $155,000.00 on April 1, 1998. There was also a hefty payment made on July 28, 1999 in the amount of $148,893.66. These are a few examples of STK's payment history with UVCC, which show, in this Court's opinion, circumstances from which STK's promise to honor the underlying obligation may be inferred. "Wholly apart from any written acknowledgment, an actual payment made...under circumstances establishing that it is intended as a part payment toward a larger debt starts the period running **anew on the balance**." *See McCoy*

---

19. UVCC argued in its post-trial brief that Debtor had waived the statute of limitations defense and directs the Court's attention to each of the demand notes, which contain an express waiver of statute of limitations defenses. This argument was not made in counsel's pretrial briefs. In any event, the waiver is not valid. The parties stipulated that New York law applies to the Statute of Limitations issue. See Evidentiary Hearing Transcript p. 3. "An agreement to waive or extend the Statute of Limitations, if *made at the inception of liabili-*

*ty* is not enforceable because a party can't make a valid promise that a statute founded in public policy is inoperative in advance. At that stage, there is a greater likelihood that a waiver of the defense, as part of the *initial contract or obligation* was the result of ignorance, improvidence, an unequal bargaining position or was simply unintended." *See John J. Kassner & Co., Inc. v. City of New York*, 46 N.Y.2d 544, 551, 415 N.Y.S.2d 785, 389 N.E.2d 99 (1979) (emphasis supplied).

*Assoc. v. Nulux, Inc.*, 218 F.Supp.2d 286, 292 (E.D.N.Y.2002)(emphasis supplied). Additionally, throughout the years in which STK made payments on the loan, STK continued to borrow money from UVCC. As the amount of money that STK borrowed increased, the weekly payments also concomitantly increased. Thus, in January, 1996, the weekly payment amount to UVCC was $2,214.00. In 2002, the weekly payment amount was $4,000.00. This increase in payments reflects that Debtor, as president of STK, was aware that he was making payments on the existing debt as well as the new indebtedness that STK continued to incur from UVCC. Debtor also testified that he received invoices from UVCC that showed credits that decreased STK's indebtedness. *See* Tr., p. 142. Thus Debtor's own testimony indicates that he was aware that the money being paid by STK was being applied to STK's entire indebtedness, and that each payment and catch up payment made by STK acknowledged the entire debt and an intention to repay it. These payments revived the six-year statute of limitations and thus, UVCC's claim is not barred by New York C.P.L.R. Section 213(4).

## IV. CAUSE TO LIFT THE STAY PURSUANT TO 11 U.S.C. § 362(d)(1)

The final issue to be decided is whether UVCC is entitled to relief from the automatic stay imposed by 11 U.S.C. § 362(d)(1) to enforce the Mortgage and seek repayment from sale of the Debtor's residence. Section 362(d)(1) provides "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—for cause, including the lack of adequate protection of an interest in property of such party in interest." UVCC argues it is not adequately protect-

ed because it is receiving no payments on the Mortgage and has not been given a replacement lien or other "indubitable" equivalent. Debtor counters that the Mortgage at issue did not contain any payment provision, and thus Debtor need not make any payments to UVCC; and further, that UVCC is adequately protected by an equity cushion of $175,000.00. UVCC counters that an equity cushion alone does not necessarily defeat a request for relief from the automatic stay.

 The parties stipulated in the joint pre-trial order that the Real Property have a value of $275,000.00. UVCC does not advance that any other lien is superior to the Mortgage, and thus there is apparently $175,000.00 in equity in the premises. UVCC bears the burden of proving its *prima facie* entitlement to relief under § 362(d)(1). *See In re Elmira Litho, Inc.*, 174 B.R. 892 (Bankr.S.D.N.Y.1994) (Bernstein, J.). Under 11 U.S.C. § 362(g), the moving party has burden of proof on issue of debtor's equity in collateral. The calculation of an equity cushion under § 362(d)(1) ignores junior liens and focuses on the creditor's interest in the collateral. *In re Elmira Litho, Inc.*, 174 B.R. 892, 904 (Bankr.S.D.N.Y.1994) (Bernstein, J.).

"Equity cushion is just one factor to consider in determining whether the creditor's interest is adequately protected. Although an equity cushion may by itself provide adequate protection under certain circumstances, this is not so especially when the Debtor does not show a sincere desire to speedily effectuate a reorganization...it would be a gross abuse of discretion to continue to protect debtor indefinitely just because he has equity in the properties. The argument that secured creditors are not harmed by delays if there is an equity cushion or if the properties are not exposed to jeopardy is merely telling one half the sto-

ry." *Daniels v. Certified Mortgage Corporation (In re Certified Mortgage Corp.),* 19 B.R. 369 (Bankr.M.D.Fla. 1982).

In this case, the debtor delayed this case for months, ostensibly to perform an appraisal of STK's assets. No plan or disclosure statement has been filed, and there are no operating reports for the months of June, 2003 through January, 2004. In fact, there is no evidence of any reorganization activity in this case since Debtor filed reports for November 2002 through May 2003, all of which were filed simultaneously on June 27, 2003. There is no indication therefore that UVCC will ever be paid the amount owed on its Mortgage in this Chapter 11 plan if the stay is not lifted. A mortgagee lacks adequate protection for its interest when no periodic payments are being made, the entire indebtedness is due and no income is derived from the property. *See In re Boca Development Associates,* 21 B.R. 624, 630–631 (Bankr.S.D.N.Y.1982). The entire indebtedness on this Mortgage was due and payable in October 2002, a year prior to the Evidentiary Hearing. Unless a sale or refinance is contemplated to payoff the debt owed to UVCC, UVCC is not adequately protected because they are not receiving periodic payments, have not been given a replacement lien, and the entire indebtedness is due. The only adequate protection UVCC has is the equity cushion that can only be realized on the sale of the property at issue. As no refinance or sale is contemplated, the stay must be lifted to allow UVCC to enforce its security interest against Debtor's property.

### CONCLUSION

For the foregoing reasons, UVCC's Motion to Lift the Automatic Stay is granted. Debtor's objections to Claims No. 7 and No. 8 are overruled. UVCC is permitted to file an amended proof of claim, and must provide the Court with an accounting of any payments made to UVCC by STK since October, 2002. A separate order will be issued by the Court.